## ROGERS v. REPUBLIC PRODUCTIONS, Inc., et al.
### No. 13220.

United States District Court
S. D. California, Central Division.
Jan. 26, 1952.

330

Gibson, Dunn & Crutcher, Henry F. Prince, Frederic H. Sturdy, Samuel O. Pruitt, Jr. and Richard H. Wolford, all of Los Angeles, Cal., for plaintiff.

Herman F. Selvin and Harry L. Gershon (of Loeb & Loeb), and Frank B. Belcher (of Jennings & Belcher), all of Los Angeles, Cal., for defendants.

HALL, District Judge.

### Findings of Fact

(1) The plaintiff Roy Rogers was at the time of the commencement of the within action and now is a citizen and resident of the County of Los Angeles, State of California.

(2) The defendant Republic Productions, Inc. was at the time of the commencement of the within action and now is a corporation duly organized and existing under the laws of the State of New York and is a citizen of said State. The defendant Hollywood Television Service, Inc. was at the time of the commencement of the within action and now is a corporation duly organized and existing under the laws of the State of Delaware and is a citizen of said State. Said defendant Hollywood Televi-

sion Service, Inc. was organized on or about November, 1950, for the express purpose of selling, leasing, or otherwise distributing through the medium of television, certain of the motion pictures formerly produced by the defendant Republic Productions, Inc. The defendant Republic Pictures Corporation was at the time of the commencement of the within action and now is a corporation duly organized and existing under the laws of the State of New York and is a citizen of said State. The defendants Republic Productions, Inc. and Hollywood Television Service, Inc. were at the time of the commencement of the within action and now are each wholly owned subsidiaries of defendant Republic Pictures Corporation. The rights of defendants Republic Pictures Corporation and Hollywood Television Service, Inc., and each of them, insofar as the subject matter of this action is concerned, are no greater than and are subject to at least the same limitations as the rights of defendant Republic Productions, Inc.

(3) The within action is a civil action wherein the matter in controversy exceeds the sum or value of Three Thousand Dollars ($3,000.00) exclusive of interest and costs.

(4) Plaintiff adopted the name "Roy Rogers" for all professional purposes in early 1938 and has at all times since said date been known professionally as Roy Rogers. By change of name proceedings plaintiff caused his name to be formally and legally changed to "Roy Rogers" in 1942. As against the defendants in this action and each of them and anyone claiming through or under them, or any of them, the plaintiff is the sole and exclusive owner of his name "Roy Rogers" and his voice and likeness and of the name and likeness of his horse "Trigger" for any and all commercial advertising purposes whatsoever, as said term "commercial advertising purpose" is defined in Finding No. 13.

(5) Plaintiff has been for many years and now is an internationally known motion picture, stage, radio and rodeo star and has achieved and maintained for many years and now has a great and widespread fame and prominence as an actor, singer,

rodeo performer, horseman and personality. Plaintiff has been for many years and now is well known and identified in the public mind throughout the United States and many foreign countries as "Roy Rogers". Plaintiff's fame as a western star has been and now is such that at all times since 1942 he has also been and now is well known and identified in the public mind as "King of the Cowboys".

(6) On or about October 13, 1937, the plaintiff Roy Rogers whose true name was then Leonard Slye, entered into a written Agreement with the defendant Republic Productions, Inc. Said Agreement was and is in printed form, except for a few typewritten words and figures, and was prepared by counsel for the defendants Republic Productions, Inc. and Republic Pictures Corporation. At and before the time of the signing of said Agreement the plaintiff was not represented by any attorney or agent acting for or on behalf of plaintiff. A full, true and correct copy of said Agreement was offered and received in evidence as plaintiff's Exhibit No. 17 and is attached hereto marked Exhibit A and made a part hereof, and for convenience and brevity will hereinafter in these Findings sometimes be referred to as the "1937 Agreement". By various letter agreements, which the Court finds to be immaterial to the dispute herein involved, the term of the 1937 Agreement was extended to on or about February 28, 1948.

(7) During the term of the 1937 Agreement the defendant Republic Productions, Inc. produced a total of sixty-three (63) motion pictures in each of which the plaintiff Roy Rogers was starred in the leading male role. A true and correct list of the titles of said motion pictures and the dates of completion of photography thereof is set forth in Exhibit B which is attached hereto and made a part hereof.

(8) On or about March 9, 1948, the plaintiff Roy Rogers entered into a written Agreement with the defendant Republic Productions, Inc. A full, true and correct copy of said Agreement which bears the date of February 28, 1948, was offered and received in evidence as plaintiff's Exhibit No. 20 and is attached hereto marked Ex-

hibit C and made a part hereof, and for convenience and brevity will hereinafter in these Findings sometimes be referred to as the "1948 Agreement". The term of said 1948 Agreement commenced on March 1, 1948, and ended on or about May 27, 1951.

(9) During the term of the 1948 Agreement the defendant Republic Productions, Inc. produced a total of eighteen (18) motion pictures in each of which the plaintiff Roy Rogers was starred in the leading male role. A true and correct list of the titles of said motion pictures and the dates of completion of photography thereof is set forth in Exhibit D which is attached hereto and made a part hereof.

(10) During the period of time covered by the terms of the 1937 Agreement and the 1948 Agreement or one of them, in addition to the eighty-one (81) motion pictures in which the plaintiff was starred (listed in Exhibits B and D hereto), the defendant Republic Productions, Inc. produced four (4) feature length motion pictures entitled respectively, "Dark Command", "Lake Placid Serenade", "Brazil" and "Hit Parade of 1947", in each of which the plaintiff appeared incidentally but did not star and during the term of the 1937 Agreement the plaintiff appeared in two (2) additional feature length motion pictures entitled respectively "Hollywood Canteen" and "Melody Time", which two motion pictures were produced by motion picture producers (not parties to this suit) pursuant to the "loan-out" provisions of the 1937 Agreement.

(11) During the period 1938 to 1951, both inclusive, plaintiff has, with the knowledge and encouragement of defendants Republic Productions, Inc. and Republic Pictures Corporation, made substantially in excess of 640 personal appearances, more than 563 rodeo appearances and substantially in excess of 242 radio appearances. Said defendants and plaintiff have from time to time each expended large sums of money in publicizing plaintiff in connection with some of said appearances. Through the expenditure of said sums of money, but primarily through and because of his own personality, industriousness, ability, performance, and exemplary personal conduct and private life, plaintiff has built up and maintained over a period of many years, and he now enjoys in the mind of the public, a great and widespread popularity, trust, good will, confidence and esteem for himself personally and for his name "Roy Rogers".

(12) For more than thirteen (13) years plaintiff has continuously used a horse named "Trigger" in his various professional appearances, as well as certain "doubles" for said horse which doubles have also been known as "Trigger"; and the said name and horse "Trigger" has been during said entire period and now is associated in the public mind exclusively with the plaintiff Roy Rogers. For many years the said Trigger and said doubles have been and they now are owned, maintained and trained by the plaintiff at his own sole cost and expense. The rights of the respective parties to the within action, as herein determined, apply equally both to Roy Rogers and to Trigger, and hereinafter in these Findings, for convenience and brevity, all references to the use of, or the rights or obligations of the parties hereto with respect to the use of, the name, voice and likeness (or any thereof) of plaintiff shall also be deemed to include and apply equally to the name and likeness (or either thereof) of plaintiff's horse Trigger.

(13) The term "advertising, commercial and/or publicity purposes" as used in the fourth sentence of paragraph 4 of the 1937 Agreement and the terms "commercial advertising" and "commercial tie-up" as used in subparagraph (B) of paragraph 4 of the 1948 Agreement were intended by the parties to be and they are synonymous with the term "commercial tie-ups for products of every kind or character (other than motion pictures)" as used in subparagraph (C) of paragraph 4 of said 1948 Agreement. Said terms were each intended to mean, and throughout the terms of the said 1937 Agreement and the said 1948 Agreement (until on or about February 1, 1950) were construed by the parties by their acts and conduct to mean, and they do mean any use whatsoever of the name, voice or likeness of the plaintiff Roy Rog-

ers (whether in still photographs or in motion pictures or otherwise or at all, and whether used as a trade name or as an endorsement, either direct or implied, or as a so-called "attention-getter" or otherwise or at all, and whether used on or in radio, television, newspapers, magazines, billboards, car cards or any other advertising medium or media whatsoever) in association with or to advertise or otherwise promote any service or product whatsoever except only (a) the defendant Republic Productions, Inc. as a producer of motion pictures and/or (b) any of the motion pictures produced by said defendant under either the 1937 Agreement or the 1948 Agreement. For convenience and brevity said terms and the meaning thereof, as in this Finding defined and limited, shall hereinafter (in these Findings and Conclusions and in the Judgment to be entered herein) be referred to as "commercial advertising" or "Commercial advertising purpose"; provided however, that for the reasons set forth in Findings Nos. 39 and 41, said terms "commercial advertising" and "commercial advertising purpose" as used in these Findings and Conclusions and in the Judgment to be entered herein, do not include the use as feature length motion pictures of any of the following four (4) feature length motion pictures produced by defendant Republic Productions, Inc. and in which the plaintiff incidentally appeared but did not star: "Dark Command", "Lake Placid Serenade", "Brazil" and "Hit Parade of 1947", and likewise do not include the use of any of the eighty-one (81) feature length motion pictures listed in Exhibits B and D hereto in theaters or any other place where an admission fee is or has been customarily charged for the entertainment or for admission to the entertainment (either in the customary manner by a projector in such place or by means of a television transmission or projection onto a screen or screens in such place) or on television screens where a fee is charged to the viewers of such screens for the privilege of viewing such motion pictures, even though some incidental advertising may also be shown on the screens in said theaters or other places or on said television screens.

(14) In 1938 the plaintiff Roy Rogers commenced a business based upon the use of his name, voice and likeness for commercial advertising purposes. In the development and maintenance of plaintiff's said commercial advertising business the plaintiff has at all times exercised great care, diligence and discretion in determining the number, type, character and quality of the products and services with which he has permitted his name, voice or likeness to be associated, and at no time has plaintiff recommended, approved or endorsed, either directly or impliedly, or permitted his name, voice or likeness to be associated with or used in connection with, any products or services except those which the plaintiff, in good faith, believed to be of good quality, suitable for safe purchase and use by the public, and of a character consistent with his widespread reputation as a wholesome cowboy of high moral character.

(15) At all times since early 1938, the plaintiff has, with the knowledge, encouragement and consent of the defendants Republic Productions, Inc. and Republic Pictures Corporation, asserted and exercised exclusive control over, and the exclusive right to receive and retain and plaintiff has received and retained any and all monetary consideration from the use of his name, voice or likeness for commercial advertising purposes.

(16) At all times since 1938, whenever anyone, including but not limited to the defendants Republic Productions, Inc. and Republic Pictures Corporation, has ever desired to use or authorize others to use plaintiff's name, voice or likeness for any commercial advertising purpose, all of said persons, including said defendants, have always first requested the consent of plaintiff before making such use, and plaintiff has always controlled the granting of such consents; provided however that from and after on or about February 1, 1950, the defendants Republic Productions, Inc., Republic Pictures Corporation and Hollywood Television Services, Inc. made the various claims set forth in Findings Nos. 18, 19 and 47 respectively.

(17) Plaintiff's said commercial advertising business has been and now is of very great value and has in each year since 1945 and now is producing for him a substantially greater income than he has received in like periods for rendering services in motion picture work. The great value of said commercial advertising business, and the great value of plaintiff's name, voice and likeness for commercial advertising purposes, is to a very large extent due to the continuous discretion, care and control which plaintiff has always exercised in determining the extent to which the manner in which and the product or service for or in connection with which his name, voice and likeness have been used for commercial advertising purposes, and the continued value of plaintiff's said commercial advertising business is directly dependent upon a continuance of such exclusive control by the plaintiff.

(18) On or about June 8, 1951, the defendant, Hollywood Television Service, Inc., with the knowledge, consent and acquiescence of Republic Productions, Inc. and Republic Pictures Corporation, caused to be mailed a letter dated June 8, 1951 (a true and correct copy of which was offered and received in evidence as plaintiff's Exhibit No. 30) to various advertising agencies and to various television networks and stations and thereby offered (for a valuable consideration to be paid to said defendant) for immediate telecasting certain of the said eighty-one (81) motion pictures listed in Exhibits B and D; and on or about June 19, 1951, and again on June 20, 1951, the defendant Hollywood Television Service, Inc., with the knowledge, consent and acquiescence of defendants, Republic Productions, Inc. and Republic Pictures Corporation, reiterated its offer of said pictures (for a valuable consideration to be paid to said defendant) for immediate telecasting and offered to license said motion pictures in groups of thirteen (13), twenty-six (26) or fifty-two (52) and said offers contemplated that the name, voice and likeness of plaintiff Roy Rogers, if the licensees of said motion pictures so desired, be regularly, repetitiously and systematically telecast to the viewing and listen-ing public, free of charge, to such viewing and listening public, for commercial advertising purposes; and said offers also contemplated the customary, systematic and repetitious use of plaintiff's name and likeness in newspapers and other advertising media regularly and customarily used to advertise a licensee's or sponsor's program and the services of products advertised thereon. Said offers contemplated that all of said motion pictures would be re-edited and shortened so that they each would have a running time of approximately fifty-three and one-half (53½) minutes and would therefore be made suitable for use on a one (1) hour television program. The prices quoted by defendant Hollywood Television Services, Inc. were quoted for said motion pictures in groups of thirteen (13), twenty-six (26) or fifty-two (52) at the rate of $30,000 per picture for one nationwide telecast or $50,-000 per picture for two such telecasts.

(19) Prior to the commencement of the within action, the plaintiff formally demanded that the defendants withdraw the written offer of June 8, 1951, and the additional oral offers of June 19, and 20, 1951, but defendants refused to comply with said demand, and said defendants then and at all times since have claimed and now claim that they have the absolute and unrestricted right to utilize and authorize others to utilize all or any of the motion pictures produced by defendant Republic Productions, Inc. and in which the plaintiff appeared and any portions or portion thereof, in any manner and for any purpose or purposes whatsoever.

(20) The first sentence of paragraph 4 of the 1937 Agreement was intended by the parties thereto to set forth and it does set forth the full extent of the only perpetual right granted by plaintiff to defendant Republic Productions, Inc. to use or authorize others to use plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) in or in connection with the advertising of any service or product whatsoever, and the parties intended said perpetual advertising right to be limited and it was limited solely to the advertising of

the defendant Republic Productions, Inc. as a producer of motion pictures and any of the motion pictures produced by Republic Productions, Inc. under said 1937 Agreement.

(21) During the term of the 1937 Agreement, the sole and exclusive right to use plaintiff's name, voice and likeness for commercial advertising purposes was expressly and intentionally recognized and acknowledged by defendants Republic Productions, Inc. and Republic Pictures Corporation to be in, and was granted to, the plaintiff in lieu of additional salary and also in consideration of the substantial and valuable publicity and advertising which defendants Republic Productions, Inc. and Republic Pictures Corporation received from plaintiff in the course of the exercise by plaintiff of said commercial advertising rights and as a result of plaintiff's other outside activities such as rodeos and other types of personal appearances in each and all of which plaintiff required and secured publicity and advertising for said defendants.

(22) By the 1948 Agreement, the parties thereto intended to and did terminate the 1937 Agreement as of on or about February 28, 1948, and intended to and did as of said date terminate all rights of defendant Republic Productions, Inc. under said 1937 Agreement except those specifically reserved in the last sentence of paragraph 29 of said 1948 Agreement.

(23) By the 1948 Agreement, and especially by the last sentence of paragraph 29 thereof, the parties thereto understood, intended to agree and did agree with respect to all results and proceeds of the plaintiff's services under the 1937 Agreement (including but not limited to the sixty-three (63) motion pictures listed in Exhibit B) that the only right reserved by said defendant to use plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) for advertising purposes was to be limited, and it was limited, solely to the advertising of the defendant Republic Productions, Inc. as a producer of motion pictures and of any of the motion pictures produced by Republic Productions, Inc.

under either the said 1937 Agreement or said 1948 Agreement.

(24) By the 1948 Agreement, the parties thereto intended to and did recognize and acknowledge that the 1937 Agreement did not give Republic Productions, Inc. any perpetual right to use plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes.

(25) The second sentence of subparagraph (A) of paragraph 4 of the 1948 Agreement was intended by the parties thereto to set forth and it does set forth the full extent of the only perpetual right granted by plaintiff to defendant Republic Productions, Inc. to use or authorize the use of plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) in or in connection with the advertising of any service or product whatsoever, and the parties intended said perpetual advertising right to be limited and it was limited solely to the advertising of the defendant Republic Productions, Inc. as a producer of motion pictures and of any of the motion pictures produced by Republic Productions, Inc. under either the 1937 Agreement or under said 1948 Agreement.

(26) Subparagraph (B) of paragraph 4 of the 1948 Agreement was intended by the parties thereto to set forth and it does set forth the sole and only right granted by plaintiff to defendant Republic Productions, Inc. to use or authorize others to use plaintiff's name, voice or likeness for commercial advertising purposes and said subparagraph (B) was intended by the parties to and it does restrict and limit the right of the defendant Republic Productions, Inc. to use or authorize others to use the name, voice or likeness of plaintiff (whether in still photographs or in motion pictures or otherwise or at all) in or in connection with advertising.

(27) The paragraphs numbered "2" in the 1937 and 1948 Agreements, respectively, including but not limited to the definitions of "photoplays" appearing therein, were not intended to be and are not a grant of any rights in any of the motion pictures produced under either of said Agree-

ments or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, and in any event were not intended to and do not grant any advertising rights whatsoever. The words "television" and "television devices" appearing in the said definitions are synonymous and were not intended to and do not refer to or grant to the defendant Republic Productions, Inc. any right to telecast or broadcast for commercial advertising purposes any of the eighty-one (81) motion pictures (listed in Exhibits B and D hereto) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used on either a "sustaining" basis or a "commercially sponsored" basis as said words "sustaining" and "commercially sponsored" are hereinafter defined in Findings Nos. 29 and 31.

(28) At the respective dates of execution of the 1937 Agreement and the 1948 Agreement, the parties intended the provisions therein in any way relating to "advertising, commercial and/or publicity purposes", "commercial advertising" and "commercial tie-ups" to be, and by their acts and conduct during the respective terms thereof construed said provisions to be, and said provisions were and are a limitation upon any and all of the provisions in either of said Agreements in any way relating to television productions, or to the broadcasting or transmission of plaintiff's name, voice or likeness by means of television, radio or otherwise, or to the exhibition or transmission of motion pictures by radio, television or other devices.

(29) A "sustaining" program is a program which is telecast or broadcast under the sponsorship of and at the expense of the station or network presenting the program and where no announcements advertising any product or service (other than the station or network) are made or shown during or directly in connection with such programs, although so-called "station break commercials" may and customarily are made or shown immediately before, during, or immediately following such sustaining programs at the time when the so-called

"station break" announcements identifying the station or network are made or shown.

(30) The use of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used on either a sustaining television or sustaining radio program would be primarily for the purposes of advertising the station or network presenting such program, of attracting and building up a listening and/or viewing audience for the program and the time period allotted to the program, and of selling such program and allotted time to a commercial sponsor or sponsors, and such use would be for commercial advertising purposes.

(31) A "commercially sponsored" program is one which is telecast or broadcast under the sponsorship of and at the expense of one or more sponsors and where announcements advertising the products or services of such one or more sponsors (other than merely the station or network over which the program is being telecast or broadcast) are made or shown at one or more times during or in connection with the program, and as used in these Findings includes so-called "participating" programs, to-wit programs, the entertainment portions of which are furnished by the station or network and during or in connection with which so-called "spot commercials" advertising products or services of two or more sponsors (other than merely the station or network over which the program is being telecast or broadcast) are made or shown at various times.

(32) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on either a sustaining or commercially sponsored basis, or the use of plaintiff's name, voice or likeness in any other advertising medium or media to advertise any service or product whatsoever (except only Republic Productions, Inc. as a producer of motion pic-

tures and any of the motion pictures produced by Republic Productions, Inc. under either the 1937 Agreement or the 1948 Agreement) would constitute a use of plaintiff's name, voice or likeness for commercial advertising purposes.

(33) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on either a sustaining or commercially sponsored basis, or the use of plaintiff's name, voice or likeness in any other advertising medium or media, to advertise any service or product whatsoever (except only Republic Productions, Inc. as a producer of motion pictures and any of the motion pictures produced by Republic Productions, Inc. under either the 1937 Agreement or the 1948 Agreement) would constitute a use of plaintiff's name, voice or likeness in a "commercial tie-up" of the type reserved exclusively to plaintiff by the 1948 Agreement.

(34) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on a commercially sponsored basis, or the use of plaintiff's name, voice or likeness in any other advertising medium or media to advertise any service or product whatsoever would cause an association in the minds of the viewing and/or listening public between the plaintiff's name, voice or likeness and the product or service being advertised.

(35) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on a sustaining basis, would cause an association in the minds of the viewing and/or listening pub-

lic between the plaintiff's name, voice or likeness and the station or network presenting the program.

(36) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on a commercially sponsored basis, or the use of plaintiff's name, voice or likeness in any other advertising medium or media to advertise any service or product whatsoever, would create in the minds of the viewing and/or listening public the belief that the plaintiff approved, endorsed or recommended the product or service of such sponsor or other advertiser.

(37) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, or of any still photograph of plaintiff or any recording of plaintiff's voice, on a sustaining basis would create in the minds of the viewing and/or listening public the belief that the plaintiff approved, endorsed or recommended the station or network presenting the program.

(38) The principal value to a commercial sponsor or station or network in telecasting or broadcasting any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, would be in the name, reputation and sincerity of the plaintiff; and it would be the primary aim, intent, and hope of any such commercial sponsor or station or network to favorably associate the name and reputation of the plaintiff with the sponsor's service or product and to indicate to the public either directly or indirectly that the plaintiff approves, recommends or endorses the said service or product and to trade on the name and good will which the plaintiff has built up over a period of many years and to capture for

338

such sponsor's service or product as great a portion as possible of the good will which attaches to the name, voice and likeness of Roy Rogers.

■ (39) The defendants do not have any right whatsoever (under either the 1937 Agreement or the 1948 Agreement or otherwise or at all) to use the name, voice or likeness of plaintiff (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes; and without in any way limiting the generality of the foregoing, the Court expressly finds that the defendants, and each of them, do not have any right whatsoever (under either the 1937 Agreement or the 1948 Agreement or otherwise or at all) to telecast or broadcast or to authorize others to telecast or broadcast for commercial advertising purposes any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, on either a sustaining or commercially sponsored basis. As to the four (4) motion pictures referred to in Findings No. 10, to wit, "Dark Command", "Lake Placid Serenade", "Brazil" and "Hit Parade of 1947", in each of which the plaintiff appeared incidentally but did not star, the plaintiff in open court waived any right that he otherwise would have had to prevent the showing of said feature length motion pictures for advertising purposes so long as they are shown substantially in their entirety and as feature length motion pictures, but defendants may not use any scene or sound track or any other portion of said four (4) feature length motion pictures in which the name, voice or likeness of plaintiff appears or is used if said scene, sound track, or other portion is used out of context or in any other manner than as an integral part of the said feature length motion pictures. By reason of said waiver, the use of said four (4) feature length motion pictures or any of them as feature length motion pictures, was excluded from the definition of the phrases "commercial advertising" and "commercial advertising purpose" set forth in Finding No. 13.

■ (40) The 1948 Agreement and in particular the provisions of subparagraph (C) of paragraph 4 thereof, in recognizing and reserving to the plaintiff the exclusive right to enter into commercial tie-ups and to freely exercise such right, gave rise to an implied negative convenant on the part of defendant Republic Productions, Inc. and anyone claiming through or under it, not to use plaintiff's name, voice or likeness, either in still photographs or in motion pictures or otherwise or at all for commercial advertising purposes.

■ (41) Incidental advertising where the viewing and listening audience has paid the customary admission fee or charge for the entertainment or for admission to the entertainment and the effect of such incidental advertising on such audience, are substantially and materially different and are not the same as advertising and the effect thereof where no admission fee or charge is made to the viewing and listening audience and the entertainment is brought to the viewing and listening audience by an advertiser, station or network without cost to the viewing or listening audience and the parties hereto did not intend to include such incidental advertising and it was not included within the terms "advertising, commercial and/or publicity purposes", "commercial advertising" and "commercial tie-ups" or any thereof, as such terms were used in either the 1937 Agreement or the 1948 Agreement, for which reasons such incidental advertising is excluded from the definition of "commercial advertising" and "commercial advertising purpose" set forth in Finding No. 13.

(42) The purported copyrighting of the motion pictures produced by the defendant Republic Productions, Inc. under either the 1937 Agreement or the 1948 Agreement is immaterial to any issue in this action and in any event did not alter the relationship and the rights and obligations between plaintiff and defendants which are the subject matter of this action, and to the extent that said copyrights purport to include any right hereunder found to exist in plaintiff are held in trust by defendants for the benefit of plaintiff.

(43) The defendant Republic Pictures Corporation and defendant Hollywood Television Service, Inc., and each of them, have at all times had full notice and knowledge of plaintiff's exclusive right to and control over the use of his name, voice and likeness for commercial advertising purposes and likewise have at all times had full notice and knowledge of the fact that defendant Republic Productions, Inc. had no right, license, authority or consent to use or authorize others to use plaintiff's name, voice or likeness for commercial advertising purposes.

(44) Upon the termination of the 1948 Agreement on or about May 27, 1951, any and all right, license, authority or consent which any of the defendants may theretofore have had or claimed to have had with respect to the use of plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes wholly ceased and terminated.

(45) At all times until on or about February 1, 1950, the defendants Republic Productions, Inc. and Republic Pictures Corporation represented to the plaintiff that they considered the television and motion picture industries to be competitive and mutually exclusive and that neither a motion picture artist nor a motion picture producer could serve both the motion picture and television industries; and at all times prior to said date said defendants represented to plaintiff that they had no intention or desire to telecast and would not telecast any of the motion pictures produced by Republic Productions, Inc. under either the 1937 Agreement or the 1948 Agreement.

(46) It is not true that the defendant Republic Productions, Inc. in the negotiations leading up to the execution of the 1948 Agreement ever requested, or that the plaintiff ever agreed to grant to said defendant, the unqualified right to telecast either the motion pictures theretofore produced under the 1937 Agreement or the additional motion pictures to be produced under the 1948 Agreement. On the contrary, the Court expressly finds from said negotiations, from the provisions of the 1948 Agreement, from the conduct of the parties, and from the parties' mutual construction and interpretation of the 1937 Agreement and the 1948 Agreement, that the parties to said 1948 Agreement understood, intended and agreed that plaintiff was to have the sole and exclusive right to and the control over the use of his name, voice and likeness for commercial advertising purposes, and that said exclusive right and control in plaintiff was not intended to be limited, and was not limited to plaintiff's name, voice or likeness outside of motion pictures but was intended by the parties to include plaintiff's name, voice and likeness whether in still photographs or in motion pictures or otherwise or at all.

(47) At no time prior to on or about February 1, 1950, did the defendants, or any of them, ever claim the right to use any of the motion pictures produced by the defendant Republic Productions, Inc. under either the 1937 Agreement or the 1948 Agreement, or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, for any commercial advertising purpose. The first time any such claim was made by any of the defendants was on or about February 1, 1950, at which time the defendant Republic Productions, Inc. did claim such right, and plaintiff thereupon immediately advised said defendant that it had no right to use any of said motion pictures or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, for commercial advertising purposes, and that its rights in said motion pictures were subject and subordinate to plaintiff's exclusive right to use his name, voice and likeness for commercial advertising purposes. Whenever in these Findings, reference is made to the parties' mutual construction or mutual interpretation of the 1937 and 1948 Agreements by their acts and conduct, such reference shall be understood to mean the acts and conduct of the parties beginning in 1937 and extending continuously throughout the

340

terms of the 1937 and 1948 Agreements until on or about February 1, 1950.

(48) At all times from about 1938 until on or about February 1, 1950, defendants Republic Productions, Inc. and Republic Pictures Corporation, and each of them, by their acquiescence, representations and conduct represented to, encouraged, led and permitted the plaintiff to believe, and he did believe, that he had the sole and exclusive right to use and authorize others to use his name, voice and likeness (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes and to receive and retain all monetary consideration therefrom, and said defendants intended that plaintiff should rely upon such acquiescence, representations and conduct, and plaintiff did so rely, and in reliance thereon has heretofore over a long period of years developed a large and valuable commercial advertising business based upon the licensing of his name, voice and likeness for commercial advertising purposes and has expended a great amount of time, effort and money in the development of said business and has entered into or authorized others to enter into numerous valuable contracts with third parties whereby for a consideration, but always subject to the control of plaintiff, said third parties were authorized to use plaintiff's name, voice or likeness in or in connection with the advertising of the service or product of such licensed persons. As hereinbefore found, the plaintiff was granted and encouraged by defendants to exploit said commercial advertising rights in lieu of additional salary and also in consideration of the substantial and valuable publicity and advertising which defendants Republic Productions, Inc. and Republic Pictures Corporation received from plaintiff in the course of the exercise by plaintiff of said commercial advertising rights and as a result of plaintiff's other outside activities such as rodeos and other types of personal appearances.

(49) Now to permit the defendants Republic Productions, Inc. and Republic Pictures Corporation, or either of them, or anyone claiming under or through said defendants or either of them, to assert or exercise any right whatsoever to use or authorize others to use plaintiff's name, voice or likeness (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes would cause plaintiff immediate, substantial and irreparable damage and would also immediately and substantially damage those licensed by plaintiff, for each of which reasons said defendants Republic Productions, Inc. and Republic Pictures Corporation, and each of them, and any and all persons claiming through or under them or either of them, including but not limited to the defendant Hollywood Television Service Inc., are and each of them is estopped now to claim or assert or exercise any right, license or authority which they might otherwise have had or claimed to have had to use or authorize others to use the name, voice or likeness of plaintiff (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes.

(50) The defendants Republic Productions, Inc. and Republic Pictures Corporation and each of them, prior to the commencement of the within action, waived any right, license or authority which they or either of them might otherwise have had or claimed to have had to use or authorize others to use the name, voice or likeness of plaintiff (whether in still photographs or in motion pictures or otherwise or at all) for commercial advertising purposes, first, by their conduct, second, in lieu of additional salary, third, in consideration of the substantial and valuable publicity and advertising which defendants Republic Productions, Inc. and Republic Pictures Corporation received from plaintiff in the course of the exercise by plaintiff of said commercial advertising rights and as a result of plaintiff's other outside activities such as rodeos and other types of personal appearances, and fourth, by the express provisions of the 1948 Agreement.

(51) At no time during the term of either the 1937 Agreement or during the term of the 1948 Agreement, did the defendant Republic Productions, Inc. request or call upon plaintiff to render any services in any so-

called "television productions" or in connection with the broadcasting or transmission of his name, voice or likeness by means of television or broadcasting or in the production, exhibition or transmission of motion pictures by means of television or radio, nor did plaintiff render any such services. On the contrary, such services as were requested by the defendant Republic Productions, Inc. and rendered by plaintiff were solely in connection with the making of motion pictures which were produced for exhibition to the public upon the payment of an admission fee or charge, and such services were neither requested by said defendant Republic Productions, Inc. nor rendered by plaintiff for use for commercial advertising purposes.

(52) Immediate, substantial and irreparable damage and injury will be inflicted upon plaintiff if defendants are permitted to pursue their presently contemplated and threatened course of conduct and telecast or authorize others to telecast any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, on either a sustaining basis or a commercially sponsored basis, (except only to advertise the defendant Republic Productions, Inc. as a producer of motion pictures and any of the motion pictures produced by said defendant under either the 1937 Agreement or the 1948 Agreement) and the Court expressly finds that any such telecast of any of said motion pictures or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, will inflict immediate, substantial and irreparable injury upon plaintiff and will immediately, substantially and irreparably damage all elements of plaintiff's commercial advertising business, and will further inflict immediate, substantial and irreparable injury upon plaintiff in that the value of plaintiff's name, voice or likeness for commercial advertising purposes will immediately be destroyed or substantially damaged and diluted, and that plaintiff's name, reputation and good will, and the public's trust,

confidence and admiration for plaintiff will be immediately subjected to jeopardy and irreparable damage and injury in that under defendant's contemplated and threatened course of conduct the plaintiff's name, voice and likeness will be associated with, will be used in connection with, and will be used for the purpose of selling, products and services over the type, quality and character of which plaintiff will have no control.

(53) One of the principal elements of value to anyone using plaintiff's name, voice or likeness in commercial advertising is the existence of control on the part of the plaintiff over the use of his name, voice or likeness by others whereby a user may be granted the exclusive right to use plaintiff's name, voice or likeness in the particular field or fields of such user. If defendants are permitted to pursue their present course of conduct and to telecast or permit others to telecast any of the motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, for commercial advertising purposes, plaintiff would thereby be deprived of control over the use of his name, voice and likeness in said motion pictures or said scenes or sound tracks therefrom or said portions thereof, for commercial advertising purposes, and would thereby be deprived of his ability to grant exclusivity in any particular field of endeavor to any particular user of his name, voice or likeness for commercial advertising purposes.

(54) It is customary in the radio and television industries for a sponsor to negotiate and contract in advance for programs to be broadcast or telecast over a period of at least thirteen (13) weeks, normally commencing in the Fall of each calendar year. The costs, expenses and commitments which must be made by a sponsor for both talent and station or network time in connection with commercially sponsored radio or television programs is very substantial and amounts to many thousands of dollars, much of which must normally and necessarily be committed for or expended far in advance of the actual date

342

of broadcasting or telecasting of any given program and such programs by national advertisers may ultimately involve expenditures of several millions of dollars per annum. Pursuant to such custom, from a date prior to September, 1950 until the month of April, 1951 the plaintiff negotiated with his then radio sponsor, The Quaker Oats Company, for a contract or contracts pursuant to which plaintiff would continue to appear on radio for said Company and would also begin appearances on television on behalf of said Company commencing not later than the Fall of 1951. As a result of, among other things, the defendants' threats to telecast or allow others to telecast for commercial advertising purposes certain of the eighty-one (81) motion pictures listed in Exhibits B and D, the said The Quaker Oats Company terminated negotiations for a continuance of the radio program and for the contemplated new television program. Commencing immediately after the discontinuance of said negotiations with The Quaker Oats Company, the plaintiff continuously attempted to negotiate a contract or contracts with various other potential sponsors for his appearance on radio and television programs commencing in the Fall of 1951. As a result of said efforts plaintiff did make informal arrangements pursuant to which he commenced a thirteen (13) weeks' radio program on or about October 5, 1951, but plaintiff was unable to arrange for a television program to commence in the Fall of 1951, and was unable to make any arrangements for either radio or television programs which did not contain an option in favor of the sponsor whereby such sponsor could cancel such arrangement in the event that any of the eighty-one (81) motion pictures listed in Exhibits B and D (or any versions thereof modified and shortened so as to be suitable for use on a one hour television program) were telecast on either a sustaining or commercially sponsored basis. The claims and threats of the defendants, of which The Quaker Oats Company had knowledge shortly after they were first made in February 1950, were in fact a substantial and contributing cause of the termination of the negotiations between plaintiff and The Quaker Oats Company and interfered with and delayed plaintiff in making arrangements with said sponsor or others for radio or television appearances. The said claims and threats of the defendant have substantially interfered with and damaged plaintiff and the plaintiff has actually incurred substantial monetary damages as a proximate result of said claims and threats of defendants, but it is impossible upon the evidence adduced at the trial to ascertain the specific amount of monetary damages suffered by plaintiff.

(55) Defendants' present course of conduct and their claim to the absolute and unrestricted right to use and to authorize others to use for commercial advertising purposes any or all of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff appears or is used, and the claim of said defendants to the right to receive and retain substantial monetary consideration for such use now constitute and if permitted to continue will constitute unjust and unfair competition with the plaintiff and now constitute and will constitute a wrongful interference with and a violation of plaintiff's long acknowledged and well established right freely and exclusively to engage in the business of using and of authorizing others to use his name, voice and likeness for commercial advertising purposes.

(56) Any allegations in the Answer of defendants which are in any way contrary to or in conflict with any of the foregoing Findings of Fact are and each of them is hereby found to be untrue.

From the foregoing Findings of Fact, the Court makes the following

## Conclusions of Law

(1) The Court concludes in all respects as set forth in the foregoing Findings of Fact, and any Conclusion of Law that is contained therein is hereby expressly incorporated in these Conclusions of Law with the same force and effect as though expressly set forth herein.

(2) This Court has jurisdiction of the cause pursuant to Section 1332 of Title 28 of the United States Code.

(3) As against the defendants in this action and anyone claiming through or under them, or any of them, the plaintiff is the sole and exclusive owner of his name "Roy Rogers" and his voice and likeness and of the name and likeness of his horse "Trigger" for any and all commercial advertising purposes whatsoever and none of the defendants has any right to use plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) for any commercial advertising purpose or purposes whatsoever.

(4) The defendants and each of them are estopped to use or authorize others to use plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) for any commercial advertising purpose or purposes whatsoever.

(5) The defendants and each of them have waived any right which they or any of them might ever have had or claimed to have had to use or authorize others to use plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) for any commercial advertising purpose or purposes whatsoever.

(6) Such limited commercial advertising rights as were granted by the plaintiff to the defendant Republic Productions, Inc. expired upon the termination of the 1948 Agreement on or about May 27, 1951, and neither the provisions of the 1937 Agreement nor the provisions of the 1948 Agreement granted to the defendants or any of them any right whatsoever from and after May 27, 1951, to use or authorize others to use plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) for any commercial advertising purpose or purposes whatsoever.

(7) The telecasting or broadcasting of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff or of his horse Trigger appears or is used, on either a sustaining basis or commercially sponsored basis, or any other use of plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) in any other advertising medium or media, for any commercial advertising purpose or purposes whatsoever would constitute unfair competition with the plaintiff.

(8) Immediate, substantial and irreparable damage and injury will be inflicted upon the plaintiff if defendants are permitted to telecast or broadcast or authorize others to telecast or broadcast any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff or of his horse Trigger appears or is used, on either a sustaining basis or commercially sponsored basis, or use or authorize others to use plaintiff's name, voice or likeness or the name or likeness of his horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) in any other advertising medium or media, for any commercial advertising purpose or purposes whatsoever.

(9) Plaintiff has actually incurred substantial monetary damages as a proximate result of the claims, threats, acts and conduct of defendants but the amount thereof cannot be ascertained from the evidence adduced at the trial, and plaintiff is therefore not entitled to a judgment for money damages.

(10) Plaintiff has no plain, speedy or adequate remedy at law.

(11) Plaintiff is entitled to a permanent injunction against defendants and each of them, and their respective officers, agents, servants, employees, attorneys and all persons in active concert or participation with them or any of them, enjoining and restraining them, and each of them, from in any manner using, exhibiting, tele-

344

casting, broacasting, leasing, selling, licensing or disposing of or authorizing any other or others in any manner to use, exhibit, telecast, broadcast, lease, sell, license or dispose of, for any commercial advertising purpose or purposes whatsoever, the name, voice or likeness of the plaintiff Roy Rogers or the name or likeness of plaintiff's horse Trigger (whether in still photographs or in motion pictures or otherwise or at all) in or on any advertising medium or media whatsoever, including but without in any way limiting the generality of the foregoing, any use, exhibition, telecast (on either a sustaining basis or a commercially sponsored basis), broadcast (on either a sustaining basis or a commercially sponsored basis), lease, sale license or disposored basis), lease, sale, license or disposition, for any commercial advertising purpose or purposes whatsoever of any of the eighty-one (81) motion pictures (listed in Exhibits B and D) or any scene or sound track therefrom or any other portion thereof in which the name, voice or likeness of plaintiff or of his horse Trigger appears or is used.

(12) Plaintiff is entitled to an order forever releasing and exonerating plaintiff and his surety (National Surety Corporation, a New York Corporation) and each of them, from that certain "Undertaking on Temporary Restraining Order and Preliminary Injunction" filed herein on June 23, 1951, and that certain "Additional Undertaking on Preliminary Injunction" filed herein on July 25, 1951, and from each of said Undertakings.

(13) Plaintiff is entitled to recover his costs herein incurred.

Let Judgment Be Entered Accordingly.

# Exhibit A.

## REPUBLIC PRODUCTIONS, INC.

AGREEMENT executed at North Hollywood, California, October 13, , 19 37 , by and between REPUBLIC PRODUCTIONS, INC., a New York corporation, hereinafter referred to as the "producer", and LEONARD SLYE ...................... , hereinafter referred to as the "artist",

WITNESSETH:

For and in consideration of the covenants, conditions and agreements hereinafter contained and set forth, the parties hereto have agreed and do hereby agree as follows:

1. The producer hereby employs the artist to render his exclusive services as herein required for and during the term of this agreement and the artist hereby accepts such employment and agrees to keep and perform all of the duties, obligations and agreements assumed and entered into by him hereunder.

2. The artist agrees that throughout the term hereof he will render the services hereinafter specified, solely and exclusively for and as requested by the producer; that he will render his services as an actor in such roles and in such photoplays and/or other productions as the producer may designate; that he will make personal appearances in motion picture theatres and/or other places of entertainment and/or will render his services as an actor in vaudeville, plays and/or in all other kinds of performances on the speaking stage; that he will render his services as a radio performer, not only by broadcasting in person, but also by making electrical transcriptions and/or by any other present or future methods or means; that he will render his services as an actor in television productions; and that he will render his services in connection with the broadcasting and/or transmission of his likeness and/or voice by means of television, radio and/or photoplays, whether such broadcasting and/or transmission be either directly or indirectly in connection with or independent of photoplays. The artist further agrees that he will promptly and faithfully comply with all reasonable instructions, directions, requests, rules and regulations made or issued by the producer in connection with the services to be performed by the artist hereunder; and that he will perform and render his services hereunder conscientiously and to the full limit of his ability and as instructed by the producer at all times and wherever required or desired by the producer. The term "photoplays" as used in this agreement shall be deemed to include, but not be limited to, motion picture productions produced and/or exhibited and/or transmitted with sound and voice recording, reproducing and/or transmitting devices, television, radio devices and all other improvements and devices which are now or hereafter may be used in connection with the produc-

tion and/or exhibition and/or transmission of any present or future kind of motion picture productions.

3. The artist further agrees that during the term hereof he will not render his services as an actor, or pose, act, appear, write, direct or render any other services in any way connected with motion pictures or photoplays, nor will he render any services of any kind or character whatsoever, in any way connected with dramatic, theatrical, musical, vaudeville, radio, television or other productions, shows, performances and/or entertainment, nor will he render any other similar services to or for himself, or to or for any person, firm or corporation other than the producer, without the written consent of the producer first had and obtained. The artist further agrees that he will not consent to nor permit any other person to advertise, announce or make known, directly or indirectly, by paid advertisements, press notices, or otherwise, that he has contracted to do or perform any act or services contrary to the terms of this agreement. The producer shall have the right to institute any legal proceedings, in the name of the artist or otherwise, to prevent such acts, or any of them.

4. The artist expressly gives and grants to the producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances of any and all kinds during the term hereof, and to record his voice and all instrumental, musical and other sound effects produced by him, and to reproduce and/or transmit the same, either separately or in conjunction with such acts, poses, plays and appearances, as the producer may desire; and further gives and grants to the producer solely and exclusively all rights of every kind and character whatsoever in and to the same, or any of them, perpetually, including as well the perpetual right to use the name of the artist and pictures or other reproductions of the artist's physical likeness, and recordations and reproductions of the artist's voice, in connection with the advertising and exploitation thereof, as well as in connection with the advertising and/or exploitation of any other services which may be required of the artist hereunder. The producer shall have the right to "dub" the voice of the artist and all instrumental, musical and/or other sound effects to be produced by the artist to such extent as may be desired by the producer, such dubbing of the artist's voice to be in English and/or in any other language or languages designated or desired by the producer. The producer shall also have the right to use a "double" for the acts, poses, plays and appearances of the artist to such extent as may be desired by the producer. The artist does also hereby grant to the producer, during the term hereof, the sole and exclusive right to make use of, and to allow others to make use of, his name for advertising, commercial and/or publicity purposes (other than in connection with the acts, poses, plays and appearances of the artist hereunder), as well as the sole and exclusive right to make use of and distribute, and to allow others to make use of and distribute, his pictures, photographs or other reproductions of his physical likeness and of his voice for like purposes. The artist shall at no time during said term grant the right to, authorize or willingly permit any person, firm or corporation other than the producer to make use of his name or to make use of or distribute his pictures, photographs or other reproductions of his physical likeness or of his voice, and authorizes the producer, in the name of the artist or otherwise, to institute any proper legal proceedings to prevent such acts, or any of them.

5. The artist agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer or the motion picture, theatrical or radio industry in general.

6. The artist hereby expressly gives and grants to the producer the right to lend the services of the artist to any other person or persons, in any capacity in which the artist is required to render his services hereunder, upon the distinct understanding and condition, however, that this contract shall, nevertheless, continue in full force and effect and that the artist shall not be required to do any act or perform any services contrary to the provisions of this agreement. Any breach by any such person, however, of any of the terms of this agreement shall not constitute a breach by the producer of its obligations or covenants under this agreement, nor shall the artist have the right to terminate this agreement by reason of any such breach by any such person, but the artist, at his option, in the event of such breach by any such person, shall be released from the obligation to render further services to such person. In the event that the artist is required to render services for any other person or persons as hereinabove provided, he agrees to render the same to the best of his ability. Should the services of the artist be loaned to any other person or persons hereunder, such other person or persons, at the option of the producer, shall be entitled to all or any of the advertising and other rights in connection with services rendered by the

artist for such other person or persons as are given to the producer under the terms of this agreement.

7. In the event that the producer desires, at any time or from time to time, to apply, in its own name, or otherwise, but at its own expense, for life, health, accident or other insurance covering the artist, the artist agrees that the producer may do so and may take out such insurance for any sum which the producer may deem necessary to protect its interests hereunder. The artist shall have no right, title or interest in or to such insurance, but agrees, nevertheless, to assist the producer in procuring the same by submitting to the usual and customary medical and other examinations and by signing such applications and other instruments in writing as may reasonably be required by such insurance company or companies.

8. In the event that by reason of mental or physical disability, or otherwise, the artist shall be incapacitated from fully performing the terms hereof or complying with each and all of his obligations hereunder, or in the event that he suffer any facial or physical disfigurement materially detracting from his appearance on the screen or interfering with his ability to perform properly his required services hereunder, or in the event that his present facial or physical appearance be materially altered or changed, or in the event that he suffer any impairment of his voice, then in either or any of said events this agreement shall be suspended during the period of such disability or incapacity or facial or physical disfigurement or change of present facial or physical appearance, or impairment of voice, and no compensation need be paid the artist during the period of such suspension. The term of this agreement, and all of its provisions herein contained, may be extended, at the option of the producer, for a period equivalent to all or any part of the period of such suspension. The producer, at its option, in the event of the continuance of such disability or incapacity or facial or physical disfigurement or change of present facial or physical appearance or impairment of voice for a period or aggregate of periods in excess of three (3) weeks during the terms hereof, may cancel and terminate this employment. The producer shall have the right, at its option, to have medical examinations of the artist made at any time and from time to time by such physician or physicians as the producer may designate.

9. In the event that at any time during the term hereof the producer, or any person to whom the services of the artist are loaned by the producer hereunder, should be materially hampered, interrupted or interfered with in the preparation, production or completion of photoplays by reason of any fire, casualty, lockout, strike, labor conditions, unavoidable accident, riot, war, act of God, or by the enactment of any municipal, state or federal ordinance or law, or by the issuance of any executive or judicial order or decree, whether municipal, state or federal, or by any other legally constituted authority, or by any national or local emergency or condition, or by any other cause of the same or any similar kind or character, or if by reason of the illness or incapacity of any principal member of the cast (other than the artist) or of the director of any photoplay in which the artist is rendering or is scheduled to render services, the production of such photoplay is suspended, interrupted or postponed, or if for any reason whatsoever the majority of the motion picture theatres in the United States shall be closed for a week or any period in excess of a week, then and in any of said events this agreement, at the option of the producer, may be suspended, likewise, during the continuance of such event or events, and no compensation need be paid the artist during the period of such suspension, and the term of this agreement, at the option of the producer, may be continued and extended, upon the same terms and conditions as shall then be operative hereunder, for a period equivalent to all or any part of any period or periods during which any such event or events shall continue. If such suspension or suspensions or any such event or events should continue for a period or aggregate of periods in excess of twelve (12) weeks during the term hereof, then and in that event the producer, at its option, may cancel and terminate the artist's employment hereunder. If such suspension or suspensions should continue for a period or aggregate of periods in excess of twelve (12) weeks during the term hereof when the rate of compensation hereunder is One Hundred Fifty Dollars ($150.00) a week or more, the artist, at his option, may elect to terminate the artist's employment hereunder; provided, however, that should the artist desire to elect to terminate his employment he shall serve notice of such desire upon the producer, and if the producer should not resume the payment of the weekly compensation hereinafter specified, commencing as of not later than one (1) week after the receipt of such notice from the artist, then and in that event the employment of the artist hereunder shall be terminated. If the producer should resume the payment of such compensation, commencing as of not later than one (1) week after the receipt of such notice, then and in that event the employment of the artist hereunder shall not be terminated but shall con-

tinue in full force and effect. The provisions of the next succeeding sentence of this paragraph 9 shall be deemed to be a part of this contract during and only during any period in which the rate of compensation hereunder is less than One Hundred Fifty Dollars ($150.00) per week. During any contract period in which the rate of compensation hereunder is less than One Hundred Fifty Dollars ($150.00) per week, any suspension or suspensions pursuant to the provisions of this paragraph 9 shall be limited to four (4) weeks; provided, however, that the producer shall have the right to continue such suspension from week to week, not exceeding eight (8) additional weeks, but during such suspension in excess of four (4) weeks the producer shall pay the artist compensation hereunder at a rate equal to one-half (½) the rate of compensation herein provided for with respect to the term or period in which such suspension in excess of four (4) weeks occurs.

10. The artist warrants and represents to the producer and agrees that the artist is and shall be a member in good standing of Screen Actors Guild, Inc., and will remain so for the duration of this contract.

11. Notwithstanding anything elsewhere contained herein, it is expressly agreed that if at the time of the expiration of this agreement the artist is engaged in a photoplay or photoplays or in the rendition of any of his other required services hereunder, and if the producer shall not then have exercised an option for the further services of the artist for a further period, then and in that event the artist's employment hereunder, at the option of the producer, may be continued and extended, at the same rate of salary and upon the same conditions as shall be operative hereunder immediately prior to the time of such expiration, until the completion of such of the artist's required services hereunder as the producer may desire in connection therewith, not exceeding sixty (60) days. If, after the expiration of this employment, the producer should desire the services of the artist in making retakes, added scenes, sound track, or any change or changes in any photoplay in which the artist shall have appeared during his employment hereunder, then and in either of said events the artist agrees to render such services in connection therewith as and when the producer may request, unless the artist is otherwise employed, but if otherwise employed, the artist will cooperate to the fullest extent in the making of such retakes, added scenes, sound track and/or changes, and for services actually rendered in the making thereof the artist shall be paid at the same rate of compensation as the artist was receiving immediately prior to the expiration of this employment, except that such compensation shall be paid only for the days on which the artist is actually so employed.

12. It is distinctly understood and agreed by and between the parties hereto that the services to be rendered by the artist under the terms hereof, and the rights and privileges granted to the producer by the artist under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by the artist of any of the provisions contained in this agreement will cause the producer irreparable injury and damage. The artist hereby expressly agrees that the producer shall be entitled to injunctive and other equitable relief to prevent a breach of this agreement by the artist. Resort to injunctive and other equitable relief, however, shall not be construed as a waiver of any other rights that the producer may have in the premises, for damages or otherwise. In the event of the failure, refusal or neglect of the artist to perform or observe any of his obligations hereunder to the full limit of his ability or as instructed, the producer, at its option, shall have the right to cancel and terminate this employment, may refuse to pay the artist any compensation during the period of such failure, refusal or neglect on the part of the artist, and shall likewise have the right to extend the term of this agreement and all of its provisions for a period equivalent to all or any part of the period during which such failure, refusal or neglect continues. If, at the time of such failure, refusal or neglect, the artist shall have been cast to portray a role in a photoplay, or shall have been directed to render any other of his required services hereunder, then and in either of said events the producer shall have the right to refuse to pay the artist any compensation during the time which would have been reasonably required to complete the portrayal of said role and/or to render such other services, or (should another person be engaged to portray such role or to render such other services) until the completion of such role or such other services by such other person; and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time or for any portion thereof. Should the producer notify the artist that the artist has been cast to portray a role in a photoplay or to perform any other of his required services hereunder, and should the artist thereupon or at any time prior to the designated date of commencement of the rendition of such services advise the producer that the artist does not intend to render such services, the producer shall thereupon or at any time thereafter have the right

to refuse to pay the artist any compensation commencing as of the date on which the artist has so advised the producer of his intent not to perform, or, at the producer's election, as of any time thereafter, and continuing until the expiration of the time which would have been reasonably required to complete the portrayal of said role and/or to render such other services, or (should another person be engaged to portray such role or to render such other services) until the completion of such role or of such other services by such other person; and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time or for any portion thereof. Any period during which the producer is entitled to refuse to pay compensation to the artist pursuant to any of the provisions of this paragraph shall, unless sooner terminated, end if and when the artist shall be requested by the producer to and shall render other services hereunder. The producer shall also have the right, at its option, to extend the term of this agreement and all of its provisions for a period of time equivalent to all or any part of any leave or leaves of absence granted the artist by the producer during the term hereof. Each and all of the several rights, remedies and options of the producer contained in this agreement shall be construed as cumulative and no one of them as exclusive of the others or of any right or priority allowed by law. All options granted to the producer herein for extending the term of this agreement, other than the options hereinafter in paragraph 23 specifically set forth, may be exercised by the producer by notice in writing to be served upon the artist at any time prior to the expiration of the term hereof.

13. If this agreement be suspended or if the producer refuse to pay the artist compensation, pursuant to any right to do so herein granted to the producer, or if the producer grant any leave of absence to the artist, and if in connection with such suspension, refusal to pay or leave of absence, the producer shall exercise the right to extend this agreement for a period equivalent to all or any part of the period of such suspension, refusal to pay or leave of absence, then and in that event the running of the then current term or period of the artist's employment hereunder shall be deemed to be interrupted during the period of such suspension, refusal to pay or leave of absence, but shall be resumed immediately upon the expiration of such suspension or leave of absence or (in case of any such refusal to pay) upon the resumption of the payment of compensation, and (subject to subsequent extension or termination for proper cause) shall continue from and after the date of such resumption for a period equal to the unexpired portion of such term or period at the time of the commencement of such suspension, refusal to pay or leave of absence, less a period equal to that portion, if any, of the period of such suspension, refusal to pay or leave of absence, for which the producer does not exercise the right to extend this agreement. In the event of any such extension the dates for the exercise of any subsequent options and the dates of the commencement of any subsequent optional period or periods of employment hereunder shall be postponed accordingly. During the period of any such suspension, refusal to pay or leave of absence the artist shall not have the right to render his services to or for any person, firm or corporation other than the producer without the written consent of the producer first had and obtained. Should the producer pay any money or compensation to the artist for or during all or any part of any period in which this agreement is suspended, or in which the artist is not entitled to compensation, or in which the producer is entitled to refuse to pay compensation to the artist, then and in that event, at the option of the producer, the money and/or compensation so paid the artist shall be returned by the artist to the producer on demand, or the same may be deducted by the producer from any compensation earned hereunder by the artist after such period, but this provision shall not be deemed to limit or exclude any other rights of credit or recovery, or any other remedies, the producer otherwise may have. Wherever in this agreement reference is made to the phrases "the term hereof", "the term of this agreement", or other phrases of like tenor, such references (unless a different meaning clearly appears from the context) shall mean and be deemed to refer to the original period of the artist's employment hereunder and/or to whichever of the optional periods of employment provided for in paragraph 23 hereof may be current at the time referred to.

14. No waiver by the producer of any breach of any covenant or provision of this agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other covenant or provision.

15. All notices which the producer is required or may desire to serve upon the artist under or in connection with this agreement may be served by addressing the same to the artist at such address as may be designated from time to time in writing by the artist, or if no such address be designated in writing by the artist, or, if having designated an address, the artist cancels the same and fails to designate a new address, then by addressing the same to the artist at any place where the producer has a studio or an office and, in

any case, by depositing the same so addressed, postage prepaid, in the United States mail, or by sending the same so addressed by telegraph or cable, or, at its option, the producer may deliver the same to the artist personally, either in writing or, unless otherwise specified herein, orally. If the producer elect to mail such notice or to send the same by telegraph or cable, then the date of mailing thereof, or the date of delivery thereof to the telegraph or cable office, as the case may be, shall be the date of the service of such notice.

16. Nothing in this contract contained shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material statute, law or ordinance contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provision of this agreement affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

17. The producer/artist agrees to furnish all modern wardrobe and wearing apparel necessary for any and all roles to be portrayed by the artist hereunder; it being agreed, however, that should so-called "character" or "period" costumes be required the producer shall supply the same. It is distinctly understood and agreed, however, that in no event shall the producer be required to furnish shoes, hosiery, or underclothing for the artist; but the artist shall supply at his own expense all shoes, hosiery and underclothing (other than "character" or "period" shoes, hosiery or underclothing) necessary for any and all roles to be portrayed by him hereunder. All costumes, apparel, and other articles furnished or paid for by the producer pursuant to the terms of this agreement, or otherwise, shall be and remain the property of the producer and shall be returned promptly to it.

18. The services of the artist hereunder are to be rendered at such place or places as may from time to time be designated by the producer. When the artist is required to render his services on location the producer agrees to furnish such necessary and reasonable meals and transportation as may reasonably be required for the artist during and on account of the rendition of such services and where, in the judgment of the producer, it is necessary for the artist to remain on such location overnight, the producer agrees to furnish necessary lodging for the artist. The artist shall not be deemed to be on location when rendering services at or near the studio then generally used by the producer as the base for the production of its photoplays.

19. The artist expressly agrees that until the expiration of the term hereof he will be available at all times in Los Angeles, California, or any other place the producer may designate, unless excused in writing by the producer. The artist further agrees that if and when requested by the producer to do so, he will report at the producer's studio, or at any other place the producer may designate, for wardrobe fittings, publicity interviews, publicity photograph sittings, making tests and/or "stills", and for such discussions as the producer may deem necessary or desirable; it being understood, however, that no compensation whatsoever shall be or become payable to the artist for the compliance by the artist with such request of the producer; provided, however, that if the artist shall be required to render any services as aforesaid for the producer during any period or periods in which the rate of compensation hereunder is less than One Hundred Fifty Dollars ($150.00) per week, the artist shall be paid therefor on the same basis and at the same rate as herein elsewhere provided.

20. Where necessary herein, all terms used in the masculine gender shall apply to the feminine gender.

21. The producer may transfer or assign all or any part of its rights hereunder to any person, firm or corporation, and this agreement shall inure to the benefit of the producer, its successors or assigns.

22. On condition that the artist shall fully and completely keep and perform each and every term and condition of this agreement on his part to be kept or performed, the producer agrees to compensate the artist therefor and for all rights herein granted and/or agreed to be granted by the artist to the producer at the rate of     Seventy-Five and no/100 .............................. Dollars ($  75.00    ) per week, payable for each week during which the artist shall have actually rendered his services hereunder (other than as provided in paragraph 19 hereof) either in connection with the production of a photoplay or photoplays or in the performance of any of his other required services hereunder. Conditioned as aforesaid, the producer agrees that compensation will be paid to the artist for a period or aggregate of periods of not less than      ...... twenty ...... ( .. 20 .. )    weeks     during the original term hereof and for a period or aggregate of periods of not less than twenty (20) weeks during each six (6) months optional period of employment for which an option is exercised hereunder, and for a period or aggregate of periods of not less than forty (40) weeks during each one (1) year optional period of

employment for which an option is exercised hereunder; provided, however, that the foregoing shall be deemed to have been fully complied with in any year of this agreement for which compensation shall be paid to the artist for a period or aggregate of periods of forty (40) weeks. In computing compensation to be paid or deducted with respect to any period of less than a week, the weekly rate shall be prorated, and for this purpose the rate per day shall be one-sixth (1/6) of the weekly rate. For the purposes of this paragraph the term "year of this agreement" shall be deemed to mean any period of three hundred sixty-five (365) consecutive days. If during the original term hereof or during any optional period of employment for which an option is exercised hereunder, this agreement be suspended, pursuant to any provision for suspension herein contained, or if the producer refuse to pay the artist compensation pursuant to any right to do so herein granted to the producer, then the minimum periods hereinabove specified, during which the producer is obligated to pay compensation to the artist, shall be reduced by a period equivalent to the period or aggregate of periods of such suspension or suspensions or refusal to pay. Any compensation due the artist hereunder shall be payable on Thursday of each week for services rendered up to and including the Wednesday preceding. During any period or periods in which the artist is not entitled to compensation pursuant to the provisions of this paragraph, he shall be deemed to be laid off without pay, and during such periods, of course, the artist shall not have the right to render his services for any person, firm or corporation without the written consent of the producer first had and obtained. Any such layoff of the artist shall be for a period of at least one (1) consecutive week, subject to recall for retakes and added scenes, but if there remains insufficient time at the end of the term hereof to lay the artist off for a period of at least one (1) consecutive week during the balance of said term, the producer may, nevertheless, lay off the artist for the remaining unexpired balance of said term even though such balance be less than one (1) week. During any such layoff period the producer may recall the artist for retakes and added scenes. For the purposes of the preceding two sentences any period or periods during which the artist is not entitled to compensation pursuant to the provisions of paragraphs 8, 9 or 12 hereof shall not be deemed to be layoff periods.

22½. The artist agrees

23. The term of employment hereunder shall commence on October 13, , 19 37 , and shall continue for a period of .... Six months .... ( ..6.. ) from and after said date. In consideration of the execution of this agreement by the producer and of the consent of the producer to the amount of compensation herein set forth, the artist hereby gives and grants to the producer the following rights or options:

(a) To extend the term of employment of the artist for an additional period of six ( 6 ) months from and after the expiration of the term hereinbefore specified, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this first extended period at the rate of One Hundred Twenty-five
Dollars ($ ~~125.00~~ ) 100.00 [Modified $100] per week.

(b) To extend the term of employment of the artist for an additional period of six ( 6 ) months from and after the expiration of said first extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this second extended period at the rate of One Hundred Fifty Dollars ($ 150.00 ) [Exercised 9/8, $150] per week.

(c) To extend the term of employment of the artist for an additional period of six ( 6 ) months from and after the expiration of said second extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this third extended period at the rate of One Hundred Seventy-five Dollars ($ 175.00 ) [Exercised 3/27, $175] per week.

(d) To extend the term of employment of the artist for an additional period of six ( 6 ) months from and after the expiration of said third extended period, upon

the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this fourth extended period at the rate of     Two Hundred Fifty     Dollars

200.00

<s>($ 250.00 )</s>     [Exercised 9/8 $200; Increased 2/28/40 to $300]     per week.

(e) To extend the term of employment of the artist for an additional period of     six ( 6 )     months     from and, after the expiration of said fourth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this fifth extended period at the rate of     Three Hundred     Dollars

250.

<s>($ 300.00 )</s>     [$250 Exercised 3/6/40 at $300]     per week.

(f) To extend the term of employment of the artist for an additional period of     six ( 6 )     months     from and after the expiration of said fifth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this sixth extended period at the rate of     Three Hundred Fifty     Dollars

300

<s>($ 350.00 )</s>     [$300]     per week.

(g) To extend the term of employment of the artist for an additional period of     six ( 6 )     months     from and after the expiration of said sixth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this seventh extended period at the rate of     Four Hundred     Dollars

350.

<s>($ 400.00 )</s>     [$350]     per week.

(h) To extend the term of employment of the artist for an additional period of     six <s>( 6 )     months</s>  1 yr.     from and after the expiration of said seventh extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this eighth extended period at the rate of     Six

400.

Hundred     Dollars <s>( $600.00 )</s>     [1yr., $400]     per week.

(i) To extend the term of employment of the artist for an additional period of     one ( 1 )     year     from and after the expiration of said eighth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this ninth extended period at the rate of     Seven Hundred Fifty

500.

Dollars <s>($ 750.00)</s>     [1yr., $500]     per week.

(j) added at 1 yr.—600.  [1yr., $600]

<s>(j) To extend the term of employment of the artist for an additional period of</s>
( )         from and after the expiration of said ninth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this tenth extended period at the rate of     Dollars ($     ) per week.

(k) To extend the term of employment of the artist for an additional period of
( )         from and after the expiration of said tenth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this eleventh extended period at the rate of     Dollars ($     ) per week.

(l) To extend the term of employment of the artist for an additional period of
( )         from and after the expiration of said eleventh extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this twelfth extended period at the rate of     Dollars ($     ) per week.

(m) To extend the term of employment of the artist for an additional period of
( )         from and after the expiration of said twelfth extended period, upon the same terms and conditions as herein contained, except that compensation shall be paid to the artist for this thirteenth extended period at the rate of     Dollars ($     ) per week.

Each option hereinbefore referred to may be exercised separately at least fifteen (15) days prior to the expiration of the respective next preceding period of employment, or the producer, at any time, but at least fifteen (15) days prior to the expiration of the term hereof or of any extension thereof, may elect to exercise all or any of the options not already exercised, in which event the term of this agreement shall be extended by the period or periods specified in the option or options so exercised by the producer. The exercise by the producer of any one or more of said options shall not be construed as an election by it not to exercise the remaining options. All notices of the exercise of any

option shall be in writing and shall be served upon the artist within the periods above specified.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written.

REPUBLIC PRODUCTIONS, INC.

By *[signature]*

Secretary-Treasurer

*[signature: Leonard Sly]*

(Artist)

## Exhibit B.

## Titles and Dates of Completion of Photography of Motion Pictures Starring Roy Rogers, Produced During Term of 1937 Agreement.

| TITLE | DATE OF COMPLETION |
|---|---|
| Under Western Stars | March 29, 1938 |
| Billy the Kid Returns | August 8, 1938 |
| Come on Ranger | October 20, 1938 |
| Shine on Harvest Moon | November 16, 1938 |
| Rough Riders Patrol | January 28, 1939 |
| Frontier Pony Express | March 3, 1939 |
| Southward Ho | April 12, 1939 |
| In Old Caliente | May 13, 1939 |
| Wall Street Cowboy | August 1, 1939 |
| The Arizona Kid | August 25, 1939 |
| Saga of Death Valley | October 13, 1939 |
| Days of Jesse James | November 16, 1939 |
| Young Buffalo Bill | March 9, 1940 |
| Carson City Kid | May 16, 1940 |
| Ranger and the Lady | June 14, 1940 |
| Colorado | July 27, 1940 |
| Bad Men of Deadwood | July 31, 1940 |
| Young Bill Hickok | August 27, 1940 |
| The Border Legion | October 17, 1940 |
| Robin Hood of the Pecos | November 25, 1940 |
| In Old Cheyenne | February 25, 1941 |
| Sheriff of Tombstone | April 5, 1941 |
| Nevada City | May 6, 1941 |
| Jesse James at Bay | September 9, 1941 |
| Red River Valley | November 5, 1941 |
| Man From 'Cheyenne | December 4, 1941 |
| South of Santa Fe | January 3, 1942 |
| Sunset on the Desert | February 21, 1942 |
| Romance on the Range | April 18, 1942 |
| Sons of the Pioneers | May 27, 1942 |
| Sunset Serenade | July 25, 1942 |
| Heart of the Golden West | September 19, 1942 |
| Ridin' Down the Canyon | October 4, 1942 |
| Idaho | December 31, 1942 |
| King of the Cowboys | February 4, 1943 |
| Song of Texas | April 12, 1943 |
| Silver Spurs | May 15, 1943 |
| Man from Music Mountain | July 6, 1943 |
| Hands Across the Border | September 21, 1943 |
| Cowboy and the Senorita | January 26, 1944 |
| Yellow Rose of Texas | March 10, 1944 |

| TITLE | COMPLETION DATE OF |
|---|---|
| Song of Nevada | April 2, 1944 |
| San Fernando Valley | June 22, 1944 |
| Lights of Old Santa Fe | July 31, 1944 |
| Utah | December 22, 1944 |
| Bells of Rosarita | February 9, 1945 |
| Man From Oklahoma | March 29, 1945 |
| Sunset in El Dorado | June 28, 1945 |
| Don't Fence Me In | August 6, 1945 |
| Along the Navajo Trail | September 6, 1945 |
| Song of Arizona | December 22, 1945 |
| Rainbow Over Texas | January 29, 1946 |
| My Pal Trigger | March 16, 1946 |
| Under Nevada Skies | April 17, 1946 |
| Roll On Texas Moon | May 17, 1946 |
| Home in Oklahoma | July 3, 1946 |
| Helldorado | July 25, 1946 |
| Apache Rose | September 27, 1946 |
| Bells of San Angelo | January 20, 1947 |
| Springtime in the Sierras | March 19, 1947 |
| On the Old Spanish Trail | June 11, 1947 |
| Gay Ranchero | August 20, 1947 |
| Under California Stars | December 15, 1947 |

# Exhibit C.

## AGREEMENT

AGREEMENT executed at North Hollywood, California, on February 28th, 1948, by and between REPUBLIC PRODUCTIONS, INC., a New York corporation, herein referred to as the "Producer", and Roy Rogers, herein referred to as the "Artist".

## WITNESSETH:

1. The Producer hereby employs the Artist to perform services as an actor in not more than nine (9) feature-length western and/or outdoor action photoplays to be designated by the Producer, and on reasonable notice to perform all reasonably required services incidental thereto, including but not limited to services in connection with making tests, stills, publicity photographs and auditions, wardrobe fittings, publicity interviews, the study of lines and scripts, and participation in conferences and discussions, the making of electrical transcriptions for use in advertising and exploiting said motion pictures, and the making of personal and radio appearances as hereinafter provided. Not more than five (5) of said photoplays shall be produced in either year of the term hereof. Unless at least two (2) of said photoplays are produced during the first year of the original term hereof, the Artist shall have the right to terminate this agreement as of the date of expiration of said first year of said term by serving notice of exercise of such right of termination on the Producer not later than seven (7) days after the expiration of said first year of said term; and similarly unless at least two (2) of said photoplays are produced during the second year of the original term hereof, the Artist shall have the right to terminate this agreement as of the date of expiration of said second year of said term by serving notice of exercise of such right of termination on the Producer not later than seven (7) days after the expiration of said second year of said term; subject, however, to the provisions of paragraphs 12 and 16 hereof; provided, however, that if the first installment of compensation of the succeeding year shall become due during such seven (7) day period the Producer may withhold payment thereof until the expiration of such seven (7) day period, and if the Artist serves notice of exercise of such right of termination, such installment shall, of course, not be payable. With respect to personal and radio appearances, it is agreed that the Artist shall not be required to make more than one personal appearance in connection with each photoplay in which he appears hereunder and one radio appearance in connection with each such photoplay, without

his consent. The Artist also agrees to make personal appearances during the term hereof at sales conventions of Republic Pictures Corporation or its successors. The Artist hereby accepts this employment and agrees to perform the services above described and to comply fully with all of his duties, obligations and agreements hereunder during the term hereof. The Producer agrees to cooperate with the Artist so as to allow him as much free time for his own purposes as reasonably possible and consistent with the Producer's requirements for his serviecs hereunder. For this purpose, the Producer agrees to advise the Artist of the tentative commencement date of his services in each photoplay hereunder with reasonable promptness after such tentative comencement date has been set by the Producer, and also of all changes made in such tentative commencement date with reasonable promptness after such changes are determined upon, and with respect to the incidental services referred to above, to advise the Artist when such services will be required as far in advance thereof as reasonably possible. The Producer further agrees that it will not require the Artist to report at the Producer's studio or elsewhere at any time when his services are not actually required and if after notifying the Artist to report, the Producer's plans with respect to the Artist's services change, the Producer agrees to notify the Artist of such change of plans as promptly as reasonably possible.

2. The Artist agrees that he will promptly and faithfully comply with all reasonable instructions and requests of the Producer in connection with the performance of his services hereunder, and with all reasonable rules and regulations of the Producer. The Artist further agrees that he will perform his services and comply with all of his agreements hereunder conscientiously and to the full limit of his talents and abilities, at all times (except as hereinafter expressly provided) and wherever required by the Producer and in accordance with the Producer's instructions and directions in all matters arising under this agreement, including those involving artistic taste and judgment. The terms "motion pictures", "photoplays" and their equivalents as used herein include but are not limited to motion picture productions produced, exhibited and/or transmitted by or with sound and voice recording, reproducing and/or transmitting devices, radio devices, television devices and all other devices and improvements, present or future, which may now or hereafter be used for or in connection with the production, exhibition and/or transmission or any present or future kind of motion picture productions.

3. The Artist agrees that he will perform his services in connection with the production of motion pictures solely and exclusively for the Producer during the term hereof, and that he will not at any time during said term, or prior to the commencement thereof, perform services as an actor, writer, director or in any other capacity in or in any way connected with motion pictures or television for himself or for any person or company other than the Producer. The Artist also agrees that he will not advertise, announce or make known, or authorize or permit any person or company to advertise, announce or make known, directly or indirectly, by any means, that the Artist has contracted to or will perform any such services for anyone other than the Producer or do any other act contrary to the terms of this agreement. The Producer shall have the right to prevent such acts or any of them by appropriate legal proceedings, and the Artist hereby authorizes the Producer to initiate and maintain such proceedings in the Artist's name or otherwise.

4. (A) The Artist hereby grants to the Producer the sole and exclusive right to his services for motion picture purposes during the term hereof, and for this purpose the Producer shall have the right to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances of any and all kinds, and to record his voice and all instrumental, musical and other sound effects produced by him, and to reproduce and/or transmit such recordings either separately or in conjunction with such acts, poses, plays and appearances, as the Producer may desire. The Artist also grants to the Producer, solely and exclusively, all rights of every kind and character whatsoever in and to all such photographs, reproductions and recordings and all other results and proceeds of his services hereunder, perpetually, and also the perpetual right to use the Artist's name and pictures or other reproductions of his physical likeness and recordations and reproductions of his voice, in connection with the advertising and exploitation thereof and of the services of the Artist hereunder. The Producer shall have the right to "dub" the voice of the Artist and all instrumental, musical and other sound effects to be produced by him to such extent as the Producer may desire, including the right to "dub" the Artist's voice in English and any other languages desired by the Producer. The Producer shall also have the right to use a "double" for the acts, poses, plays and appearances of the Artist to such extent as may be desired by the Producer.

(B) For the purpose of advertising the photoplays to be produced hereunder, and

subject to the reservations set forth in subparagraph (C) of this paragraph 4, the Artist also hereby grants to the Producer the right, during the term hereof, to use and/or authorize the use of his name and/or likeness in so-called "commercial advertising," to wit, advertising relating to products other than motion pictures, subject to the following limitations:

(a) The Producer may not use or authorize the use of the Artist's name or likeness in connection with more than twenty (20) products in either year of the term hereof, nor as the trade name, name or designation of any product, nor in connection with endorsements of any product (but the mere use of the name and/or likeness of the Artist in an advertisement shall not be considered to be an endorsement, for the purposes of this agreement), nor in connection with alcoholic beverages, tobacco, laxatives, deodorants, articles of feminine use, or any other product with which, at the time of such use or authorization, it reasonably might be considered to be detrimental or prejudicial to associate the Artist or inconsistent with or harmful to his position as a motion picture star, particularly with reference to his youthful fan audience.

(b) The Producer may not use or authorize the use of the Artist's name or likeness in connection with any "competing product" (which is defined as any product of the same class or kind as any product manufactured or sold by any person, firm or corporation with whom the Artist may then have or be negotiating for a commercial tie-up or who is the sponsor of any radio series, which the Artist may then have or be negotiating for.) The Artist will inform the Producer in writing from time to time during the term hereof of the products in connection with which the Artist may then have or be negotiating for commercial tie-ups and the persons, firms or corporations with whom the Artist may then have or be negotiating for commercial tie-ups. It is agreed, however, that the Artist shall not be estopped by the lists which he gives to the Producer from time to time aforesaid, and in order to insure compliance with the provisions of the first sentence of this subdivision (b) the Producer shall advise the Artist in writing of each commercial tie-up for the use of the Artist's name and/or likeness into which it proposes to enter, and if such product is a competing product, the Artist shall so notify the Producer in writing within ten (10) days after the service of the Producer's notice, also stating what the competing product is. If the Artist fails so to notify the Producer, the Producer may then enter into the proposed commercial tie-up. In any event, the Producer shall give due consideration to the wishes and suggestions of the Artist with respect to any such proposed commercial tie-ups.

(c) All commercial advertising authorized by the Producer pursuant to this subparagraph (B) shall be submitted to the Artist prior to publication or release, and the Producer shall give due consideration to the wishes and suggestions of the Artist with respect thereto. The Artist will act promptly in making suggestions with respect to all such material.

(d) Any consideration received by the Producer from any such commercial advertising shall promptly be paid over to the Artist.

(C) The Artist reserves to himself the right to enter into any and all commercial tie-ups for products of every kind or character (other than motion pictures) including but not limited to endorsements for commercial purposes, phonograph records, transcriptions (but the Producer shall have the right to make the use the transcriptions provided for in paragraph 1 hereof for the purposes therein provided), publications (including so-called "comic" books or magazines), guns, shirts, boots, belts, blue jeans, toys, candies and gums, and it is agreed that the Artist may freely exploit and sell such rights to any persons, firms or corporations that the Artist in his sole discretion may determine (except motion picture companies) provided, however, that the Artist agrees:

(a) He shall not use or authorize or willingly permit the use of his name, likeness, or voice in connection with alcoholic beverages, tobacco, laxatives, deodorants, or articles of feminine use, or any other product with which, at the time of such use, authorization or permission, it reasonably might be considered to be detrimental or prejudicial to associate the Artist or inconsistent with or harmful to his position as a motion picture star, particularly with reference to his youthful fan audience.

(b) In connection with publications (including so-called "comic" magazines), phonograph records, transcriptions and the like, the Artist shall from and after the date of his contract insert or cause to be inserted in all contracts and agreements appertaining thereto, a clause substantially as follows: "The Artist shall not be depicted, described, shown or mentioned, in any form whatsoever, in the character of a villain, thief, or other despicable or derogatory character, or as consuming, dispensing or handling alcoholic beverages, tobacco of any kind or form, laxatives, deodorants, articles of feminine use or any other product with which it reasonably might be considered to be detrimental or prejudicial to associate the Ar-

356

tist, or as engaging in any mental or physical dissipation, or in any manner which will appeal to the sensual emotions of the reader, but all material shall star the Artist, and depict, describe, show or mention the Artist or any character described by the name of Roy Rogers or Rogers, in a decent and virtuous manner, and as champion of right and the enemy of wrong.

(c) In connection with publications (including so-called "comic" magazines), phonograph records, transcriptions and the like, the Artist agrees that all such material shall be submitted to the Producer prior to publication or release and the Artist shall give due consideration to the wishes and suggestions of the Producer in connection with the contents and format thereof. The Producer will act promptly in making suggestions with respect to all such material.

(d) All advertising relating to any products in connection with which the Artist enters into commercial tie-ups or agreements (but not including labels, wrappings, or containers) shall mention that the Artist is a Republic star, and whenever practical shall also mention the title of a Roy Rogers photoplay then in current release.

(D) The Artist expressly reserves to himself the right to perform in rodeos and to make personal appearances in theaters and other places of entertainment for his own account prior to and during the term hereof, but at such times only as will not in any manner interfere with the Producer's requirements for his services hereunder. Whenever the Artist desires to make a personal appearance or personal appearances in a theater he agrees to consult with the Producer to determine whether one of the motion pictures in which he appears will be exhibited in the city or place in which he desires to make such personal appearance or personal appearances, in a theater or theaters at least equal in standing or character to the theater or theaters in which the Artist proposes to make such personal appearance or personal appearances, and if it is determined that such will be the case, the Artist agrees to offer his services in the making of personal appearances to the theater or theaters which will be exhibiting such photoplay, in preference to any other theater or theaters in such city or place, provided that the compensation offered to him therefor shall not be less than he could obtain for such services in such other theater or theaters in such city or place.

(E) The Artist expressly reserves to himself the right to make so-called "spot" or "guest" radio appearances (but not including television appearances) for his own account prior to and during the term hereof, but at such times only as will not in any

manner interfere with the Producer's requirements for his services hereunder and not for any motion picture company. In the event that the Artist desires to appear on any such radio program at a time when his services are being rendered for the Producer, the Producer agrees to cooperate with the Artist for the purpose of permitting him to make such appearances if reasonably possible to do so. The Artist also reserves the right to appear in one or more series of radio programs, as distinguished from "spot" or "guest" appearances (but not including television appearances and not for any motion picture company), conditioned as hereinafter provided. To the extent that any such series is broadcast during production of a photoplay hereunder, the Producer agrees to release the Artist on the day of the broadcast in time to permit him to rehearse for and make the broadcast, but not earlier than one o'clock P. M.; provided, however, that if the Artist's circumstances in connection with such broadcast are such as to require his release earlier than one o'clock P. M., the Producer agrees to cooperate with the Artist for the purpose of releasing him earlier than one o'clock P. M. if reasonably possible to do so. In connection with television, the Artist agrees not only not to make any television appearances prior to the expiration of the term hereof, as elsewhere herein provided, but also agrees not to make or willingly permit to be made any film or other device for reproduction by television by anyone other than the Producer at any time prior to the expiration of the term hereof. In connection with his radio appearances, the Artist agrees:

(a) Exclusive of "spot" or "guest" appearances, the Artist shall not make more than one (1) live broadcast during any one (1) calendar week at any time when he is engaged in the production of a photoplay hereunder.

(b) The Artist shall not have the right to render services in any live broadcast at any time when his services hereunder are being rendered on location, unless he makes appropriate arrangements without any cost or expense whatsoever to the Producer to render his services in connection with such broadcast and rehearsals therefor at such time that he is not required to leave such location earlier than one o'clock P. M. of the day of the broadcast and will be able to return to such location in sufficient time to perform his services as and when instructed on the next day that his services are required by the Producer; provided, however, that if the Artist requires additional time, the Producer agrees to cooperate with the Artist for the purpose of allowing him such additional time to make such broad-

casts when on location if reasonably possible to do so.

(c) The sponsorship and material for the broadcast shall not be concerned or connected in any way, directly or indirectly, with alcoholic beverages, tobacco, laxatives, deodorants, articles of feminine use, or any other product with which it is or reasonably might be considered to be detrimental or prejudicial to associate the artist or inconsistent with or harmful to his position as a motion picture star, particularly with reference to his youthful fan audience, nor shall any such broadcast relate, either directly or indirectly, to photoplays or the motion picture industry except with the written consent of the Producer first had and obtained.

(d) The Artist shall not be depicted, described or mentioned in any way in the character of a villain or thief or other despicable or derogatory character or as consuming, dispensing or handling any of the products referred to in subdivision (c) above, or as engaging in any mental or physical dissipation or in any other manner which will appeal to the sensual emotions of the audience, but any material depicting, describing showing or mentioning the Artist or any character described by the name of the Artist or which the Artist is to recite or sing on the program, shall refer to the Artist only in a decent and virtuous manner and shall show him to be a champion of right and an enemy of wrong. All agreements which the Artist enters into for the performance of his services on the radio shall include an express obligation on the part of the producer of the radio show to comply with the foregoing provisions. The format and script of all shows in which the Artist is to appear, and (to such extent as may be reasonably possible) all advertising material relating to such shows in which the name or likeness of the Artist is used, shall be submitted to the Producer prior to the broadcast and the Artist shall give due consideration to the wishes and suggestions of the Producer in connection therewith and shall require the producer of the program to do so likewise. The Producer will act promptly in making suggestions with respect to all such material. In this connection, however, the Producer understands that on some occasions scripts of radio shows are revised or rewritten at such a late date as would make it impracticable for the Artist to submit the same to the Producer prior to the broadcast, and in such cases submission shall be excused. All such advertising and publicity material shall mention the fact that the Artist is a Republic star and shall mention the title of at least one (1) photoplay then in current release in which the Artist appears. Similar courtesy credit shall be accorded in each broadcast itself. The Artist shall cooperate with the Producer in endeavoring to obtain prominent mention of such photoplay or photoplays in such advertising and publicity.

(e) The Artist shall notify the Producer in writing of the day of the week on which he is to perform services on the radio, at least three (3) weeks prior thereto.

(F) Notwithstanding anything to the contrary set forth in subparagraphs (d) and (E) of this paragraph 4, it is hereby expressly agreed that the Artist shall not have the right to render any personal services for himself or for any person, firm or corporation other than the Producer at any time prior to the expiration of the term hereof when the Artist willfully fails or refuses to perform his services or to comply with his other obligations and agreements hereunder; but this subparagraph (F) shall be subject to the provisions of paragraph 8 hereof relating to the "free periods."

5. The Artist agrees to conduct himself with due regard to public conventions and morals, and further agrees not to do or commit any act or thing that will reasonably tend to degrade him or to bring him into public hatred, contempt, scorn or ridicule, or that will reasonably tend to shock, insult or offend the community or offend public morals or decency, or to prejudice the Producer or the motion picture industry in general.

6. The Producer shall have the right to lend the services of the Artist to Loew's Incorporated, Twentieth Century-Fox Film Corporation, Paramount Pictures, Inc., Warner Brothers Pictures, Inc., RKO Radio Pictures, Inc., Universal Pictures Company, Inc., Columbia Pictures Corporation, and Walt Disney Productions, or to any one or more of said companies (but not to any other person, firm or corporation) for any one or more of the photoplays provided for in this agreement, subject, however, to the following conditions and limitations.

(a) The Producer shall not have the right to lend the Artist for more than one (1) photoplay in any one (1) year of the term.

(b) The Artist shall not be required to render services in connection with any particular loan-out for more than eight (8) weeks.

(c) Any photoplay for which the Artist is loaned shall be at least comparable in quality and cost to the photoplays in which the Artist has theretofore appeared hereunder.

(d) In the event that any particular loan-out of the Artist in connection with any photoplay shall continue for any period in excess of five (5) weeks the Artist shall be entitled to receive, and the Producer agrees to pay to the Artist (in addition to all oth-

er compensation payable to the Artist hereunder), an amount equal to one-half (½) of the profits, if any, made by the Producer from such loan-out. For the purposes of this subdivision (d), the "profits" made by the Producer from a loan-out shall be deemed to be the total of the sums paid by the borrower to and actually received by the Producer as consideration for the loan-out, less (1) the sum of Twenty-two Thousand Two Hundred Twenty-two Dollars and Twenty-two Cents ($22,222.22), (2) any additional compensation payable to the Artist with respect to the particular photoplay pursuant to paragraph 12 hereof, (3) the sum of Five Hundred Dollars ($500.00) and (4) costs of collection, if any. It is understood and agreed that if the Producer desires to lend the services of the Artist, it shall not be obligated to lend such services at a profit, as defined in this subdivision (d). It is further agreed that if the terms of the loan does not exceed five (5) weeks, the Artist shall not be entitled to any additional compensation with respect to such loan pursuant to the provisions of this subdivision (d), whether or not the Producer makes a profit from such loan; and in this connection, if the term of the loan is a period of five (5) weeks or less, and in addition the Producer makes the Artist's services available to the borrower after the expiration of the term of the loan for retakes, added scenes, sound track or changes, for an aggregate of not to exceed five (5) days, such loan shall, for the purposes of this subdivision (d), be considered to be a loan for a period of five (5) weeks or less (even though the aggregate time actually exceeds five (5) weeks), and the Artist shall not be entitled to any additional compensation for such loan. Any additional compensation which may accrue to the Artist pursuant to the provisions of this subdivision (d) shall become due and payable within two (2) weeks following the expiration of the loan in question, and if additional payments are received by the Producer from the borrower after such two (2) week period, then within two (2) weeks after each respective payment is received.

In the event that the services of the Artist are loaned pursuant to this paragraph 6, the services which may be performed by or required of the Artist pursuant to such loan shall be deemed to be performed or required under this Agreement in all respects and the Artist shall not be required to do any act or perform any services under any such loan contrary to the provisions of this agreement. The obligations of the borrower shall be subject to the provisions of this agreement in all respects, but no act or omission of any such company shall constitute a breach of this agreement by the Produc-

er, nor shall the Artist have the right to terminate this agreement, or have any other right or remedy against the Producer, by reason of any such act or omission of any such company. In the event, however, of any act or omission of any such company which, if it were the act or omission of the producer, would constitute a breach of this agreement by the Producer, the Artist shall be released from the obligation to perform further services for such company in connection with the particular photoplay for which the Artist's services were loaned to such company, but such right of release shall be in addition, and without prejudice, to the Artist's other rights and remedies at law or in equity against the borrower. The Artist shall perform services for such company (provided that the conditions prescribed in this paragraph 6 are complied with) conscientiously and to the full limit of his talents and abilities, and such company, at the option of the Producer, shall be entitled to the same rights in and to the results and proceeds of the Artist's services for such company, and to the advertising and other rights in connection with the particular photoplay, as the Producer would have had hereunder had such services been performed for the Producer.

7. The Artist agrees that the Producer may at any time or times, in its own or in the Artist's name, but at its own expense, apply for life, health, accident, or other insurance covering the Artist, in any amount which the Producer may deem necessary to protect its interests hereunder, provided, however, that the Artist does not represent that such insurance is obtainable. The Producer may be the beneficiary of and shall own all rights in such policies and the cash values and proceeds thereof, and the Artist shall have no right, title or interest therein or with respect thereto. The Artist agrees to assist in procuring such insurance by submitting to the customary medical examinations and by correctly preparing, signing and delivering such applications and other documents as may reasonably be required.

8. (A) The term of this agreement shall begin on March 1, 1948, and shall continue for a period of two (2) years from and after said date.

(B) However, it is expressly agreed by the Producer that the Artist shall not be required to perform services hereunder during the months of September and October (herein referred to as the "free period") of each year of the term hereof; provided, however, that if the Producer has commenced production of a photoplay hereunder at least as long prior to the commencement of the next free period as the production schedule of such photoplay, and is unable to complete the photographing and record-

ing of the Artist's role in such photoplay prior to the commencement of such free period solely because of a wilful refusal of the Artist, without justification, to perform his services for the Producer in connection with such photoplay as required by this agreement, the Producer shall be entitled to the Artist's services, and the Artist agrees to render his services for the Producer, during such free period for a period equal to the delay caused by such wilful refusal of the Artist, but not beyond the completion of the photographing and recording of such role. The Artist shall have the right to make rodeo tours and to perform any other kind of work (except in connection with motion pictures and television) for his own account during said free periods, subject to the completion of his services for the Producer in a photoplay under the conditions specified in the proviso of the proceeding sentence. The Producer shall not have the right to extend this agreement because of said free periods and the Artist shall be paid his regular installments of compensation which become due during said free periods. In the event that the Artist desires to take his free period in any particular year at any time other than as specified above, he shall have the right to designate two (2) other consecutive months during such year for such free period, provided that he notifies the Producer in writing of such other two (2) month period at least five (5) months prior to September 1 and also at least five (5) months prior to the date of commencement of the two (2) consecutive months designated by the Artist as his free period; and provided further that at least five (5) months shall intervene between each free period. The Artist shall not have the right to change the free period of any particular year more than once.

(C) The Producer agrees to endeavor to arrange its production schedule in such manner that the Artist shall have at least two (2) weeks of free time between each of the photoplays in which he is to appear hereunder and immediately following each free period. The Artist understands, however, that due to the exigencies of production, it may not always be possible for the Producer to arrange for such periods of free time between pictures or after a free period.

9. In the event of any extension of the first year of the original term of this agreement, the date of commencement of the second year of said term shall be postponed accordingly; and in the event of any extension of the second year of said term, the date of commencement of the optional term of this agreement (if the option therefor is exercised) shall be postponed accordingly, it being understood that an extension of either year of said original term shall have the effect of extending said original term for an equivalent period. The phrases "the term hereof", "the term of this agreement" or other phrases of like tenor, as used in this agreement, shall mean (unless a different meaning clearly appears from the context) the term provided for in subparagraph (A) of paragraph 8 hereof or the optional term provided for in paragraph 27 hereof, whichever may be current at the time referred to, including all extensions of the respective term, if any. Wherever reference is made in this agreement to a "year of the term", such reference, insofar as the optional term provided for in paragraph 27 hereof is concerned shall be deemed to be a reference to said optional term, and a "year of the term", as said phrase is used in this agreement, includes all extensions of the respective year of the term, if any.

10. For a good and valuable consideration, receipt of which is hereby acknowledged by the Producer, the Producer hereby agrees to pay the Artist the sum of Ten Thousand Dollars ($10,000.00) concurrently with the execution of this agreement. Receipt of said payment is hereby acknowledged by the Artist.

11. As full compensation for the services of the Artist to be rendered or tendered pursuant hereto during the original term hereof, and for all rights herein granted or agreed to be granted by the Artist to the Producer, the Producer agrees to pay the Artist the sum of Two Hundred Thousand Dollars ($200,000.00). Said compensation shall become due and payable in weekly installments as follows:

One Hundred Three (103) installments of One Thousand Nine Hundred Twenty-three Dollars and Eight Cents ($1,923.08); and

One (1) installment of One Thousand Nine Hundred Twenty-Two Dollars and Seventy-Six Cents ($1,922.76). The first installment shall become due and payable on the first Thursday following the expiration of the first week of the term hereof and the remaining installments shall become due and payable weekly thereafter, subject to the provisions of this agreement with respect to withholding payment of installments of said compensation. In connection with any such withholding for or with respect to any period of less than a week, the weekly installments may be prorated, and for this purpose the rate per day shall be one-sixth (⅙) of the respective weekly rate.

12. If at the expiration of this agreement (to wit, at the expiration of the original term or, if the option provided for in paragraph 27 hereof is exercised, at the expiration of said optional term, or if the Artist exercises the right of termination granted to him in paragraph 1 hereof, then at

the expiration of the respective year of the original term, or if the Artist exercises the right of cancellation granted to him in paragraph 27 hereof, then at the expiration of the original term hereof) the Artist is engaged in a photoplay being produced hereunder, the Artist agrees to continue to render services hereunder until the completion of such of his services as the Producer may require in connection with such photoplay, not exceeding eight (8) weeks, and additional compensation shall be payable to the Artist for said additional period at the weekly rate of One Thousand Nine Hundred Twenty-Three Dollars and Eight Cents ($1,923.08). If after the expiration of this agreement the Producer should desire the services of the Artist in making retakes, added scenes, sound track or changes in any photoplay or photoplays in which the Artist has appeared during his employment hereunder, and if all such retakes, added scenes, sound track and changes can be completed in an aggregate of not to exceed ten (10) days, the Artist agrees to render his services in connection therewith as and when the Producer may request, unless the Artist is otherwise employed, but if otherwise employed the Artist agrees to cooperate to the fullest extent in the making of such retakes, added scenes, sound track and/or changes, and no compensation shall be payable to the Artist for such additional services for said additional ten (10) days.

13. In the event that by reason of any mental or physical or other disability the Artist shall be incapacitated from fully performing the terms hereof or complying with each and all of his obligations hereunder, or in the event that he suffer any facial or physical disfigurement materially detracting from his appearance on the screen or interfering with his ability to perform properly his required services hereunder, or in the event that his present facial or physical appearance be materially altered or changed, or in the event that he suffer any impairment of his voice, or in the event that he become unable to perform his services hereunder or to comply with any of his other agreements hereunder to the fullest extent for any other cause which renders such inability excusable at law (each and all of said conditions being herein referred to for convenience as "disability", it being understood, however, that the existence of any of the foregoing conditions for not to exceed two (2) consecutive weeks or four (4) aggregate weeks during either year of the term hereof at a time or times when the Artist's services are not actually required hereunder shall not be deemed a "disability" or a part of any period of "disability" within the meaning of this paragraph 13), the Producer shall have the right to withhold payment

of all or any of the installments of the Artist's compensation which would otherwise become payable during the period or periods of such disability, and shall also have the right to extend the year of the term in which such disability occurs for a period equivalent to all or any part of such period or periods. If any suspension of payments pursuant to this paragraph should continue for a period or aggregate of periods in excess of eight (8) weeks during either year of the term hereof, the Producer may elect to terminate this agreement. The foregoing provisions for withholding payment of installments of the Artist's compensation, for extensions, and for termination are subject to the provisions of paragraph 16 hereof. In connection with any such disability, the Producer shall have the right to have the Artist examined at any reasonable time or times by any physician or physcians the Producer may designate, whether prior to or during the term hereof, and the Artist agrees to be available for and to submit to such examinations and to such tests as may be desired whenever reasonably so required.

14. In the event that at any time during the term hereof the Producer should be materially hampered, interrupted or interfered with in the preparation, production or completion of any photoplay in which the Artist is rendering or is to render services hereunder, by reason of any fire, casualty, lockout, strike, labor conditions, unavoidable accident, riot, war, act of God, the enactment, issuance or operation of any municipal, county, state or federal law, ordinance or executive, administrative or judicial regulation, order or decree, or any local or national emergency or unusual condition, or any other cause of the same or any similar kind or character, or if by reason of the illness or incapacity of any principal member of the cast (other than the Artist) of any photoplay in which the Artist is rendering or is scheduled to render services the production of such photoplay is necessarily suspended, interrupted or postponed, or if for any reason whatsoever the majority of the motion picture theaters in the United States shall be closed for a week or any period in excess of a week (each and all of said events being herein referred to for convenience as "force majeure"), then and in any of said events this agreement, at the option of the Producer, may be suspended during the continuance of such event or events, and the Producer shall have the right to withhold payment of all or any of the installments of the Artist's compensation which would otherwise become payable during the period or periods of such suspension and shall also have the right to extend the year of the term in which the force majeure occurs for a period equivalent to all or any part of any

period or periods during which any such event or events shall continue. In the event that the services of the Artist are loaned to any company pursuant to the provisions of paragraph 6 and the preparation, production or completion of the photoplay for which the services of the Artist are loaned is materially hampered, interrupted or interfered with by any "force majeure", the Producer shall have the same rights and remedies prescribed in this paragraph 14 as though the respective photoplay were one of the Producer's own photoplays. If any suspension or suspensions referred to in this paragraph should continue for a period or aggregate of periods in excess of twelve (12) weeks during either year of the term hereof, either the Artist or the Producer may elect to terminate this agreement; provided, however, that no suspension or suspensions by reason of illness or incapacity of any principal member of the cast (other than the Artist) shall authorize the Producer to exercise said right of termination; provided further that should the Artist desire to elect to terminate this agreement pursuant to this paragraph, he shall give written notice of such desire to the Producer, and if the Producer should not cancel such suspension and resume and thereafter continue the payment of the weekly installments of compensation hereinabove specified, commencing as of not later than one (1) week after the receipt of such notice from the Artist (subject, however, to suspension of the payment of installments of compensation for other proper cause), this agreement shall thereupon terminate. If the Producer should resume the payment of said installments of compensation, however, commencing as of not later than one (1) week after the receipt of such notice, and thereafter continue payments as aforesaid, this agreement shall continue in full force and effect, but the Producer shall have no further right to withhold payment of installments of compensation during such year of the term pursuant to this paragraph, or to extend such year of the term pursuant to this paragraph with respect to any period or periods during such year of the term during which any force majeure occurs after the resumption of the payment of installments of compensation. The foregoing provisions for withholding payment of installments of the Artist's compensation, for extensions, and for termination are subject to the provisions of paragraph 16 hereof.

15. (A) It is understood and agreed by and between the parties hereto that the services to be rendered by the Artist under the terms hereof, and the rights and privileges granted to the Producer by the Artist under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by the Artist of any of the provisions contained in this agreement will cause the Producer irreparable injury and damage. The Artist hereby expressly agrees that the Producer shall be entitled to injunctive and other equitable relief to prevent a breach of this agreement by the Artist. Resort to injunctive and other equitable relief, however, shall not be construed as a waiver of any other rights or remedies which the Producer may have in the premises, for damages or otherwise, nor shall the prosecution of an action at law for damages or other legal relief be construed to be a waiver of any other rights or remedies which the Producer may have in equity or otherwise. Without waiving any such other rights or remedies, the Producer may maintain an action for damages for breach of this agreement, and may also maintain subsequent actions for damages for other breaches of this agreement, and the institution or maintenance of any such action or actions shall not constitute or result in a termination of this agreement by the Producer (but shall be without prejudice to any right of the Producer to terminate this agreement whether pursuant to any provision of this agreement or any right at law). In the event of the refusal, willful failure or knowing neglect of the Artist to perform his services as provided in this agreement or to observe any of his other obligations hereunder, or in the event that the Artist advises or otherwise indicates to the Producer (directly or through his agent or attorney) that he does not intend to perform his services as provided in this agreement or to observe any of his other obligations hereunder, the Producer shall have the right to terminate this agreement at any time while such refusal, willful failure or knowing neglect continues or within fifteen (15) days after the cessation thereof, or at any time after the Artist advises or otherwise indicates to the Producer that he does not intend to perform (or within fifteen (15) days after he advises the Producer in writing that he is ready, able and willing to perform). The provisions of the preceding sentence shall not be construed to limit or exclude any other rights at law which the Producer may have, whether of termination or otherwise, in the event of a breach of this agreement by the Artist, all such legal rights being hereby expressly reserved by the Producer. In the event of the refusal, failure or neglect of the Artist to perform his services as provided in this agreement or to observe any of his other obligations hereunder, or in the event that the Artist advises or otherwise indicates to the Produc-

362

er (directly or through his agent or attorney) that he does not intend to perform his services as provided in this agreement or to observe any of his other obligations hereunder (such failure, refusal or neglect, whether actual or anticipatory, as aforesaid, being herein referred to for convenience as "default") the Producer shall have the right to withhold payment of all or any of the installments of the Artist's compensation which would otherwise become payable during the period of such default on the part of the Artist, and shall likewise have the right to extend the year of the term in which such default occurs for a period equivalent to all or any part of the period during which such default continues. Any such default of the Artist shall be deemed to continue until the Artist shall, in writing, notify the Producer of the Artist's willingness to render services hereunder and to comply with all his other obligations and agreements; provided, however, that if at the time such default commences, the Artist shall have been cast to portray a role in a photoplay or shall have been directed to render any other of his required services hereunder, and such default is of such character and duration that the Producer cannot, in its judgment (exercised reasonably and in good faith) utilize the Artist's services as planned, upon his notifying the Producer of his willingness to render services hereunder and to comply with his other obligations and agreements, the Producer shall have the right to withhold payment of all or any of the installments of the Artist's compensation which would otherwise become payable (a) during the time which would have been reasonably required to complete the portrayal of said role and/or to render such other services, or (b) should another person have been engaged to portray such role or to render such other services until the completion of such role or such other services by such other person (unless such other person does not for any reason complete such role or other services, in which event subdivision (a) just above shall govern), and in any or either of such events the Producer shall also have the right to extend the respective year of the term for a like period of time or for any portion thereof. Notwithstanding anything to the contrary above set forth in this paragraph, however, it is agreed that any period during which the Producer is entitled to withhold payment of installments of the Artist's compensation and with respect to which the Producer is entitled to extend the year of the term, pursuant to any of the provisions of this paragraph, shall and if and when the Artist shall be requested by the Producer to and shall render other services hereunder. In the event that the Artist was cast to portray a role

in a photoplay at the time of commencement of any default of the Artist hereunder, and production of such photoplay is abandoned or the Artist is taken out of the photoplay because of such default, then in addition to any other right of extension provided for in this paragraph the Producer shall also have the right to extend the then current year of the term for an additional period not to exceed four (4) weeks if necessary in order to select and prepare a substitute photoplay for the Artist. The foregoing provisions for withholding payment of the Artist's compensation, for extensions, and for termination are subject to the provisions of paragraph 16 hereof. Each and all of the several rights, remedies and options of the Producer contained in this agreement shall be construed as cumulative and no one of them as exclusive of the others or of any right or remedy allowed by law. All options granted to the Producer herein for extending a year of the term, as well as the option to cancel a photoplay pursuant to subparagraph (B) of paragraph 16, shall be exercised by the Producer by notice in writing to be served upon the Artist at any time prior to the expiration of the respective year of the term in which such option accrued; provided, however, that if the option to cancel a photoplay pursuant to subparagraph (B) of paragraph 16 shall accrue with respect to the fifth photoplay of the first year of the original term, the Producer may (provided it did not exercise its right to extend by virtue of the particular default involved, prior to the expiration of the first year of the term) exercise said option to cancel a photoplay at any time prior to the expiration of the original term.

(B) In the event of the refusal, willful failure, or knowing neglect of the Producer to observe any of its obligations hereunder, or in the event that the Producer advises or otherwise indicates to the Artist that it does not intend to observe any of its obligations hereunder, the Artist shall have the right to terminate this agreement at any time while such refusal, willful failure, or knowing neglect continues, or within fifteen (15) days after the cessation thereof, or at any time after the Producer advises or otherwise indicates to the Artist that it does not intend to perform its obligations, or within fifteen (15) days after it advises the Artist in writing that it is ready, able and willing to perform. The provisions of the preceding sentence shall not be construed to limit or exclude any other rights at law which the Artist may have, whether of termination or otherwise, in the event of a breach of this agreement by the Producer, all such legal rights being hereby expressly reserved by the Artist. Resort to injunctive and other equitable relief shall not be construed as a waiver of any other rights

or remedies which the Artist may have in the premises, for damages or otherwise, nor shall the prosecution of an action at law for damages or other legal relief be construed to be a waiver of any other rights or remedies which the Artist may have in equity or otherwise. Without waiving any such other rights or remedies, the Artist may maintain an action for damages for breach of this agreement, and may also maintain subsequent actions for damages for other breaches of this agreement, and the institution or maintenance of any such action or actions shall not constitute or result in a termination of this agreement by the Artist (but shall be without prejudice to any right of the Artist to terminate this agreement, whether pursuant to any provision of this agreement or any right at law.) Each and all of the several rights, remedies and options of the Artist contained in this agreement shall be construed as cumulative and no one of them as exclusive of the others or of any right or remedy allowed by law.

16. (A) It is recognized that this agreement grants the Producer certain rights of extension, but it is hereby declared to be the intent of the parties that no year of the term hereof shall be extended except to the extent that it may be necessary to do so in order to enable the Producer to complete the production of the full quota of photoplays in which it is entitled to the services of the Artist hereunder, during such year of the term. The term "full quota of photoplays" as used in this Paragraph 16 means five (5) photoplays, if the Producer is entitled to produce five (5) photoplays hereunder during the then current year of the term and elects to do so during said year, or four (4) photoplays if the Producer is either entitled to produce only four (4) photoplays hereunder during such year of the term or is entitled to produce five (5) but elects to produce only four (4); and said term likewise means four (4) photoplays during the optional term if the option therefor is exercised. The Artist acknowledges, however, that the manner of scheduling the production of said photoplays and the effect of the occurrence of the various contingencies with respect to which the Producer has the right of extension upon the scheduling of production of said photoplays, is a matter of business judgment and that the decision of whether and to what extent to exercise said rights of extension shall be solely within the control of the Producer. The Producer agrees to exercise its judgment in this respect reasonably and in good faith so that no year of the term shall be extended beyond the time reasonably necessary for the Producer's requirements. In this connection it is further agreed that if production of the full quota of photoplays of any year of the term is completed during such year of the

term, exclusive of any extensions, the Producer shall not exercise any right of extension which may have accrued unless failure to extend such year of the term would prejudice the Producer's schedule for the production of the full quota of photoplays of the next year of the term, if any, in which event the Producer shall exercise its right of extension only to the extent necessary so as not to prejudice its schedule for such next year of the term. Moreover if production of the full quota of photoplays of any year of the term is completed during such year of the term as extended, but prior to the expiration of the full permissible extended period, any additional extension of such year of the term shall be cancelled and any additional right of extension of such year of the term shall not be exercised, unless such cancellation or failure to exercise such further right of extension would prejudice the Producer's schedule for the production of the full quota of photoplays of the next year of the term, if any, in which event the cancellation shall be effected or the additional right of extension shall be exercised only to the extent necessary so as not to prejudice the Producer's schedule for such next year of the term.

(B) The Artist's "full compensation" for the purpose of this paragraph 16 shall be deemed to be the sum of Two Hundred Thousand Dollars ($200,000.00) for the original term and the sum of One Hundred Thousand Dollars ($100,000.00) for the optional term; provided, however, that in the event that the Artist refuses to perform his services in the production of any photoplay as required by this agreement, and solely as a result of such refusal such photoplay is abandoned or the Artist is taken out of such photoplay, the Producer may, in lieu of extending the respective year of the term because of such refusal, cancel the photoplay with respect to which the Artist has refused to render services, and upon such cancellation the Artist's full compensation shall thereupon be deemed to be reduced by the sum of Twenty-Two Thousand Two Hundred Twenty-Two Dollars and Twenty-Two Cents ($22,222.22) and the maximum number of photoplays to which the Producer is entitled hereunder shall be reduced by one photoplay; but said full compensation shall not in any event be reduced to an amount less than the Artist's earned compensation. The "earned compensation" of the Artist at any particular time, for the purposes of this paragraph 16 shall be the product of Twenty-Two Thousand Two Hundred Twenty-Two Dollars and Twenty-Two Cents ($22,222.22) times the number of photoplays in which the Artist has theretofore completed his role during the then current year of the term, or, insofar as subparagraph (D) hereof is concerned, to the date of ter-

mination or death. In the event that the right to withhold payment of installments of the Artist's compensation accrues pursuant to paragraphs 13 or 14, or pursuant to paragraph 15 (other than by virtue of such a default by the Artist as would authorize a termination of this agreement by the Producer), at a time when the Artist has not yet received his earned compensation to that time, the Producer shall continue to pay said installments of compensation during the period of disability, force majeure or such default (notwithstanding the provisions of said paragraphs 13, 14 and 15 with respect to withholding payment of said installments) until the Artist has received his earned compensation to that time, and at that point the Producer may then exercise its right to withhold payment of installments of the Artist's compensation during any further period of disability, force majeure or such default. Payment of installments of the Artist's compensation during periods of disability, force majeure or such default pursuant to the provisions of this subparagraph (B) shall be without prejudice to the Producer's right to extend the respective year of the term for all or any part of the full period of disability, force majeure or such default as provided in paragraphs 13, 14 and 15; and if the amount of compensation which the Artist is entitled to receive for the respective year of the term, as provided in subparagraph (C) of this paragraph 16, is paid prior to the expiration of such year of the term, as extended, no additional weekly installments of compensation shall be payable to the Artist for the period or periods of extension (if any) of such year of the term which follow the date of payment of the last installment of the Artist's said compensation for such year of the term.

(C) Notwithstanding the exercise by the Producer during any year of the term of the right to withhold payment of any installments of the Artist's compensation, the Artist shall be entitled (subject to the provisions of subparagraph (D) of this paragraph 16) to receive for such year of the term the sum of One Hundred Thousand Dollars ($100,000.00) (less Twenty-Two Thousand Two Hundred Twenty-two Dollars and Twenty-two Cents ($22,222.22) for any photoplay which is cancelled by the Producer pursuant to the provisions of subparagraph (B) of this paragraph 16), regardless of the number of photoplays in which the Artist performs services hereunder during such year of the term, and any unpaid balance of such compensation for such year of the term plus any additional amounts required to be paid by virtue of paragraphs 6, 12, 16(E), 18 and 25 hereof shall be due and payable to the Artist within one (1) week after the expiration of such year of the

term, or if any of said additional amounts have not yet accrued, then (as to such amounts) when they accrue.

(D) In the event that this agreement is terminated pursuant to any of the provisions of paragraphs 13, 14 or 15 hereof, or in the event of the death of the Artist prior to the date which would otherwise be the date of expiration of the term, the Producer shall be obligated to pay (a) any and all installments of the Artist's compensation which have theretofore become due but have not been paid, and (b) any and all additional amounts required to be paid by virtue of paragraphs 6, 12, 16(E), 18 and 25; and in the further event that as of the date of termination or death the earned compensation theretofore actually received by the Artist plus the arrearages referred to in clause (a) just above, if any, to be paid as aforesaid, the Producer shall also pay the Artist the amount of such excess. All payments required to be made pursuant to this subparagraph (D) shall, if theretofore accrued, be made to the Artist within one (1) week following the date of termination or (in case of the death of the Artist) shall be made to the Artist's estate within one (1) week following receipt by the Producer of notice of appointment of the Artist's executor or of the administrator of his estate, and if not theretofore accrued, shall be made when they become due.

(E) (a) If the Artist commences the performance of his services in a photoplay hereunder and the production of such photoplay is abandoned by the Producer for any cause or the Artist is taken out of the photoplay by the Producer for any cause before the Artist has substantially completed the portrayal of his role therein, such photoplay in either such event being hereinafter in this subparagraph (E) designated as an "incomplete photoplay", such photoplay shall not be counted as one of the full quota of photoplays hereunder.

(b) If, in addition to such incomplete photoplay or photoplays, the Artist completes or substantially completes the portrayal of his role in the full quota of photoplays for the year of the term in which such incomplete photoplay or photoplays were produced, he shall be entitled to additional compensation for any such incomplete photoplay or photoplays. Such additional compensation shall be computed at the rate of One Thousand Nine Hundred Twenty-Three Dollars and Eight Cents ($1,923.08) per week and shall be payable for the period that the Artist rendered services in connection with such incomplete photoplay, less any portion of said period during which the Artist's services could not be utilized by virtue of force majeure or the Artist's disability or the Artist's default. Any such additional compensation shall be due and

payable within one (1) week following the expiration of the year of the term in which such incomplete photoplay was produced.

(c) In any event, if any incomplete photoplay or any part thereof is thereafter released and the Artist appears therein in any scene or scenes whatsoever the Artist shall thereupon forthwith be entitled to all of the benefits of paragraph 26 hereof in connection with such incomplete photoplay or part thereof and shall likewise (unless the abandonment or removal of the Artist was caused solely by a refusal of the Artist to perform his services in the production of such photoplay as required by this agreement) forthwith be paid an additional sum which shall be the same percentage (but not to exceed 100%) of Twenty-Two Thousand Two Hundred Twenty-Two Dollars and Twenty-Two Cents ($22,222.22) as the number of days on which the Artist rendered services in connection with such incomplete photoplay is of the total number of days which the production schedule called for the Artist to render actual services, less, however, any additional compensation which had theretofore been paid to Artist in connection with such incomplete photoplay pursuant to subdivision (b) of this subparagraph (E).

(F) The making of any payment or payments by the Producer to the Artist pursuant to any provision of this agreement shall be without prejudice to the rights of the Producer for equitable relief or at law, for damages or otherwise, by virtue of any default hereunder by the Artist which may have occurred prior to the making of such payment or payments; and similarly the acceptance by the Artist of any payment or payments made by the Producer to the Artist pursuant to any provision of this agreement shall be without prejudice to the rights of the Artist for equitable relief or at law, for damages or otherwise, by virtue of any default hereunder by the producer which may have occurred prior to the receipt of such payment or payments.

(G) In the event of the termination of this agreement pursuant to the exercise by either party of any right of termination, all further rights of the Producer to the services of the Artist hereunder shall terminate (except as provided in paragraph 12 hereof), including all further rights of the Producer to the services of the Artist pursuant to paragraph 27 hereof, but all rights herein granted to the Producer in and to the results and proceeds of the services of the Artist and the right to use the name, voice and likeness of the Artist for advertising and publicity purposes in connection with his motion pictures, shall remain vested in the Producer notwithstanding any such termination, and the Producer agrees to continue to comply with the provisions of paragraph 26 hereof.

17. All "character" or "period" wearing apparel (except "western" wearing apparel) necessary for the portrayal of any role hereunder by the Artist shall be furnished by the Producer. All other wardrobe and wearing apparel necessary for the performance of the Artist's services hereunder shall be furnished by the Artist. Any costumes, apparel or other articles furnished or paid for by the Producer pursuant to this Agreement or otherwise shall be deemed to be furnished to the Artist solely for the Artist's use hereunder and shall be returned promptly to the Producer.

18. The services of the Artist hereunder are to be rendered at such place or places within the United States as may from time to time be designated by the Producer. When the Artist is required to render his services at any place beyond twenty-five (25) miles from Producer's North Hollywood Studios, the Producer agrees to furnish first class meals and transportation for the Artist during and on account of the rendition of such services and where, in the judgment of the Producer, it is necessary for the Artist to remain at such place overnight, the Producer agrees to furnish first class lodging for the Artist. Likewise the Producer shall at its own expense transport to any such place the Artist's horse "Trigger" (it being understood that the Artist may use one or more of several "Triggers") and special equipment furnished by the Artist in connection with any photoplay produced hereunder, but the Artist shall permit the Producer to use his horse truck for the purpose of transporting "Trigger", as provided in paragraph 25 hereof.

19. Nothing in this agreement shall be construed so as to require the commission of any act contrary to law, and whenever there is any conflict between any provision of this agreement and any material present or future law, ordinance or administrative, executive or judicial regulation, order or decree, or amendment thereof, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the affected provision or provisions of this agreement shall be modified only to the extent necessary to bring them within the legal requirements and only during the time such conflict exists.

20. The Artist warrants that he is now a member in good standing of Screen Actors Guild, Inc. and agrees that during the entire term of this agreement during such period or periods as it may be lawful for the Producer to require the Artist so to do, the Artist will remain or become and remain a member in good standing of the properly designated labor organization or organiza-

tions (as defined and determined under the applicable law) representing persons performing services of the type and character that are required to be performed by the Artist hereunder.

21. The Producer may transfer or assign this agreement to any company which owns or controls a majority of its stock or to any company with which it may be merged or consolidated or which may acquire all or substantially all of its stock and/or property or to any other corporate successor of the Producer, and this agreement shall inure to the benefit of and be binding upon the Producer and such successors or assigns. If this agreement is assigned, in accordance with the foregoing provisions, all references herein to the Producer shall likewise be deemed to be references to the assignee.

22. The Artist hereby authorizes the Producer to deduct from each installment of compensation to the Artist hereunder an amount equal to one-half of one per cent (½%) of the gross amount thereof and to pay the amount so deducted to the Motion Picture Relief Fund of America, Inc. The Producer shall also have the right, as the Artist's employer, to deduct and withhold from the Artist's compensation the amounts required to be deducted and withheld by the Producer as the Artist's employer by any present or future law, ordinances or administrative, executive or judicial regulation, order or decree, or amendment thereof, requiring the withholding or deduction of compensation.

23. No waiver by the Producer or the Artist of any breach of any covenant or provision of this agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other covenant or provision.

24. All notices which the Producer is required or may desire to serve upon the Artist under or in connection with this agreement may be served by addressing them to the Artist in care of Mr. W. Arthur Rush, Suite 116 NBC–Radio City, Sunset and Vine, Hollywood 28, California, or at such other address as the Artist may hereafter designate to the Producer from time to time in writing, and by depositing them so addressed, registered and postage prepaid, in the United States mail in Los Angeles or North Hollywood, California, or by sending them so addressed by telegraph or cable. The deposit of any notice in the United States mail in Los Angeles or North Hollywood, California, registered and postage prepaid, addressed as aforesaid, or the delivery of any notice to the telegraph or cable office in Los Angeles or North Hollywood, California, addressed as aforesaid and prepaid, shall constitute service of such notice on the Artist, and the time of receipt of such notice by the Post Office as indicated on the registry receipt or the time of delivery of such notice to the telegraph or cable office as indicated by the telegraph or cable company on the copy of the telegram or cable, shall be the time of service of such notice. All notices which the Artist is required or may desire to serve upon the Producer under or in connection with this agreement may be served by addressing them to the Producer at 4024 Radford Avenue, North Hollywood, California, or at such other address as the Producer may hereafter designate to the Artist from time to time in writing, and by depositing them so addressed, registered and postage prepaid, in the United States mail in Los Angeles, Hollywood or Beverly Hills, California, or by sending them so addressed by telegraph or cable. The deposit of any notice in the United States mail in in Los Angeles, Hollywood or Beverly Hills, California, registered and postage prepaid, addressed as aforesaid, or the delivery of any notice to the telegraph or cable office in Los Angeles, Hollywood or Beverly Hills, California, addressed as aforesaid and prepaid, shall constitute service of such notice on the Producer and the time of receipt of such notice by the Post Office as indicated on the registry receipt or the time of delivery of such notice to the telegraph or cable office as indicated by the telegraph or cable company on the copy of the telegram or cable, shall be the time of service of such notice. In the event that any such notice is mailed, telegraphed or cabled from a location other than those herein above specifically authorized, such notice shall not be effective until actually received by the addressee. Either party hereto may also (in lieu of or in addition to the aforementioned mailing, telegraphing or cabling) deliver any notice to the other party in writing personally.

25. In addition to the compensation elsewhere herein provided for, the Producer agrees to pay the Artist the sum of Five Hundred Dollars ($500.00) for each photoplay in which he renders any services hereunder as consideration for the use of the Artist's "western" wardrobe, his horse, "Trigger" (it being understood that the Artist may use one or more of several "Triggers"), special silver saddles, horse truck, and other equipment furnished by the Artist in connection with the production of said photoplays (including his house trailer, if he should desire the use of a house trailer). The Artist agrees to furnish the equipment mentioned, including all such equipment as he has customarily furnished in the past, for said consideration.

26. The Producer agrees to give the Artist and his horse, "Trigger," top and first star billing on the positive prints of each photoplay in which the Artist appears here-

under, and to give the Artist and his horse, "Trigger," top and first star billing in all paid advertising and paid publicity issued by the Producer in connection therewith. Such billing need not appear before the title of the photoplay. No other member of the cast shall be given credit on said positive prints or in said advertising or publicity, in type as large as or larger than that used for the name of the Artist, except that any co-star or co-stars may be given credit in type as large as that used for the Artist, and the name of such co-star or co-stars may appear on the same line as the name of the Artist. The Producer shall not have the right to give co-starring credit to any other member of the cast of any such photoplay without the Artist's consent; provided, however, that the Producer may, without the Artist's consent, co-star any star engaged by the Producer for the particular photoplay, who has been theretofore regularly starred or co-starred in photoplays regularly acceptable in de luxe or "A" motion picture theaters. The Producer shall not be obligated to give the Artist or his horse, "Trigger", credit in so-called "teaser" or special advertising, or in advertising, publicity or exploitation relating to the story upon which the respective photoplay is based, any other members of the cast, the director, the author or similar matters, or in so-called "group" advertising, or in so-called "trailer" or other advertising on the screen, nor at any time when the Artist fails to conduct himself in the manner provided in paragraph 5 hereof. No casual or inadvertent failure to give the Artist credit in advertising and publicity as provided in this paragraph shall constitute a breach of this agreement.

27. In consideration of the execution of this agreement by the Producer, the Artist hereby grants to the Producer the option to extend the employment of the Artist hereunder for an additional term of one (1) year from and after the expiration of the original term hereof, upon and subject to the same provisions set forth in this agreement (except as hereinafter provided), on condition, however, that at the time of exercising said option the Producer is not in default under this agreement. In the event that the Artist considers the Producer to be in default under this agreement at the time of exercising said option, the Artist shall notify the Producer thereof in writing within ten (10) days following service of the Producer's notice of exercise of option, and shall specify in his notice, with particularity, the respects in which he considers the Producer to be in default. Should the Artist fail to serve such notice on the Producer within said period of ten (10) days the Producer shall not be deemed to be in default hereunder insofar as its right to exercise

said option is concerned, and said option shall be deemed to be validly exercised. If, having exercised said option, the Producer should be in default hereunder at the expiration of the original term, the Artist shall have the right to cancel the optional term by notifying the Producer in writing of the exercise of this right of cancellation not later than ten (10) days following the expiration of the original term. If any installment of compensation of the optional term shall become due during such ten (10) day period the Producer may withhold payment thereof until the expiration of such ten (10) day period, and if the Artist serves notice of exercise of such right of cancellation, such installment or installments shall, of course, not be payable. Such cancellation shall take effect as of the date of expiration of the original term, but the Producer shall continue to be entitled to the services of the Artist pursuant to paragraph 12 hereof, if necessary. In the event that said option is exercised, the provisions of this agreement shall be deemed to be modified in the following respects during the optional term:

(a) The amount of compensation payable to the Artist for this optional term shall be the sum of One Hundred Thousand Dollars ($100,000.00), payable in fifty-one (51) installments of One Thousand Nine Hundred Twenty-Three Dollars and Eight Cents ($1,923.08), and one installment of One Thousand Nine Hundred Twenty-Two Dollars and Ninety-Two Cents ($1,922.92), weekly in the manner provided in paragraph 11 hereof.

(b) The maximum number of photoplays, for which the Producer shall be entitled to the Artist's services during this optional term shall be four (4); provided, however, that if the Artist is engaged in rendering services in connection with a photoplay hereunder at the expiration of the original term, and his services in such photoplay are not then completed, the Producer shall have the right to require the completion of such services in connection with such photoplay during the optional term and such photoplay shall not be counted as one of said four (4) photoplays.

(c) All references in this agreement to Twenty-Two Thousand Two Hundred Twenty-Two Dollars and Twenty-Two Cents ($22,222.22) shall be deemed to be changed to Twenty-Five Thousand Dollars ($25,000.00) insofar as this optional term is concerned.

Said option may be exercised at any time, but not later than ninety (90) days prior to the date of expiration of the original term. If said original term is extended by reason of the extension of any year of said term pursuant to any provision of this agreement, said period of ninety (90) days shall be computed from the expiration of the term as extended unless the right of extension

is exercised subsequently to the date which would otherwise have been the commencement date of such ninety (90) day period, in which event such ninety (90) day period shall be computed (for the purpose only, however, of determining the latest date for the exercise of said option) as though the right of extension had not been exercised. The exercise of said option by the Producer shall not be deemed to be a waiver by the Producer of any prior breach of this agreement by the Artist, whether known or unknown, or a ratification by the Producer of any prior course of conduct of the Artist. Notice of exercise of said option shall be in writing.

28. This agreement contains the entire contract between the parties hereto, and each party acknowledges that neither has made (either directly or through any agent or representative) any representations or agreements in connection with this employment not specifically set forth herein. This agreement may be modified or amended only by agreement in writing executed by the Artist and the Producer, and not otherwise.

29. All contracts of employment, and amendments thereto, heretofore entered into between the Producer and the Artist which have not already expired by reason of lapse of time or otherwise, including, but not limited to, that certain contract of employment between the Producer and the Artist (then known as Leonard Slye) dated October 13, 1937, as amended, are hereby cancelled and terminated effective as of the date of execution of this agreement, and each of the parties thereto is hereby released from all further obligations, agreements, claims, demands and liabilities thereunder or with respect thereto except that the Producer is not released from the obligation to give screen and advertising credit to the Artist to the extent and subject to the conditions provided in such contract or contracts. Specifically, but without limiting the generality of the foregoing the Producer hereby releases the Artist from the obligation to render any further services under any such contract or contracts and from all liability or alleged liability for any breach or alleged breach of any such contract, and the Artist hereby releases the Producer from the obligation to pay any further compensation to the Artist and from all liability with respect thereto under any such contract or contracts. Such termination of said contract or contracts is without prejudice to the retention by the Producer, and the Producer hereby expressly reserves, all of its rights in and to all of the results and proceeds of the services heretofore rendered by the Artist for the Producer, and its right to use the name, voice and likeness of the Artist for advertising and publicity purposes in connection with his motion pictures, and the Artist hereby acquiesces in and agrees to said reservation of rights.

In Witness Whereof, the parties hereto have executed this agreement as of the day and year first above written.

Republic Productions, Inc.
By Robert V. Newman
Asst. Sec'y
Roy Rogers
Roy Rogers

## Exhibit D.

### Titles and Dates of Completion of Photography of Motion Pictures Starring Roy Rogers, Produced During Term of 1948 Agreement.

| TITLE | DATE OF COMPLETION |
|---|---|
| Eyes of Texas | April 17, 1948 |
| Nighttime in Nevada | May 15, 1948 |
| Grand Canyon Trail | July 2, 1948 |
| The Far Frontier | August 16, 1948 |
| Susanna Pass | February 4, 1949 |
| Down Dakota Way | April 4, 1949 |
| The Golden Stallion | May 24, 1949 |
| Bells of Coronado | August 19, 1949 |
| Twilight in the Sierras | October 18, 1949 |
| Sunset in the West | April 5, 1950 |
| North of the Great Divide | May 20, 1950 |
| Trail of Robin Hood | July 12, 1950 |
| Spoilers of the Plains | August 29, 1950 |
| Heart of the Rockies | October 25, 1950 |
| Trigger, Jr. | December 19, 1950 |
| In Old Amarillo | January 24, 1951 |
| South of Caliente | March 22, 1951 |
| Pals of the Golden West | May 23, 1951 |